UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
ST. CLAIR SHORES GENERAL EMPLOYEES                  x
RETIREMENT SYSTEM,                                  x        06 Civ. 688 (SWK)
                                                    x
                    Plaintiff,                      x        **OPINION AND ORDER**
                                                    x
                    -against-                       x
                                                    x
PAUL EIBELER, et al.                                x
                                                    x
                    Defendants.                     x
----------------------------------------X

**SHIRLEY WOHL KRAM, U.S.D.J.**

This litigation comes before the Court on a motion to dismiss filed by the Special Litigation Committee (the "SLC" or the "Committee") of the board of directors (the "Board") of Take-Two Interactive Software, Inc. ("Take-Two" or the "Company"). The SLC seeks dismissal of the derivative claims advanced by the plaintiff, St. Clair Shores General Employees Retirement System ("St. Clair"), on the grounds that the continued prosecution of these claims is not in Take-Two's best interests. Additionally, the SLC contends that St. Clair's purported direct claims are actually derivative in nature, and should be dismissed for failure to make a demand upon the Board. For the reasons that follow, the Court grants the SLC's motion to dismiss St. Clair's derivative claims, but denies the SLC's motion to dismiss St. Clair's purported direct claims.

## I.    BACKGROUND

Take-Two "develops, publishes and distributes interactive software games for personal computers, videogame consoles, and handheld videogame platforms." (Am. Compl. ("AC") ¶ 17.) The Company's premier product, the Grand Theft Auto line of video games, depicts "controversial" subject matter involving sex and violence. (AC ¶¶ 43-45.)

### A. Factual Background of this Litigation

This litigation arises out of the leveling off and subsequent decline of Take-Two's share price in 2004 and 2005. The plaintiff, St. Clair, alleges that Take-Two enjoyed robust revenue growth (AC ¶ 47), coupled with a sharp increase in its share price (AC 15 graph; see also AC ¶ 46), in the years following the release of the initial installment of Grand Theft Auto in 1997 (AC ¶ 45). St. Clair's avers, however, that Take-Two's robust growth was founded at least in part upon fraudulent business and accounting practices, whose public revelation at the close of 2003, and throughout calendar years 2004 and 2005, caused the Company's share price to decline sharply. (AC ¶¶ 2-8.) These alleged fraudulent practices are manifold, but they fall into four basic categories: (1) the improper booking of sales on products that Take-Two knew would be returned; (2) the unlawful accounting for improperly-dated incentive options granted to Take-Two's officers and directors; (3) the wrongful

institution of deficient internal financial controls; and (4) the mischaracterization of Take-Two's compliance with industry content-rating requirements for its video games. In the sections that follow, the Court outlines the contours of these four alleged fraudulent course of conduct.

### 1. The Channel-Stuffing Scheme

According to St. Clair, between October 31, 2000, and July 31, 2001, Take-Two engaged in a series of "parking" transactions in which certain of the Company's retail partners purchased Take-Two products at the end of fiscal periods, on the condition that Take-Two subsequently repurchase those products (the "Channel-Stuffing Scheme"). (AC ¶ 48.) The Channel-Stuffing Scheme produced a substantial overstatement of Take-Two's revenue (AC ¶ 48), which led the Securities and Exchange Commission (the "SEC") to conduct an informal investigation of the Company in November 2001 (AC ¶ 49). In February 2002, in response to the SEC's informal investigation and on the basis of a separate internal investigation conducted by Take-Two, the Company restated its financial results for fiscal years 2000 and 2001 (the "2002 Restatement"). (AC ¶ 50.) The 2002 Restatement eliminated some $26 million in improperly recognized net sales, and noted that the Company would take a $19 million charge to properly account for losses. (AC ¶ 51.) The 2002 Restatement

also indicated that the SEC would pursue a formal investigation of Take-Two's financial reporting and accounting. (AC ¶ 52.)

The SEC's formal investigation ultimately culminated in Take-Two's announcement on December 18, 2003, that the SEC would pursue a civil enforcement action against the Company. (AC ¶¶ 53, 54.) The share price of Take-Two's stock dropped more than 8% in response to that announcement. (AC ¶ 55.)

**2. The Options-Backdating Scheme**

St. Clair also charges that several officers and directors of Take-Two participated in a fraudulent, options-backdating scheme, which caused the Company millions of dollars in losses (the "Options-Backdating Scheme"). (AC ¶ 79.) Take-Two's stock option plans generally required that incentive options awarded to the Company's officers and directors carry an exercise price no less than the fair market value of Take-Two stock on the grant date. (AC ¶¶ 90, 93.) Nonetheless, on December 11, 2006, Take-Two reported that a special committee of the Board had found "improprieties in the process of granting and documenting stock options," and had determined "that incorrect measurement dates for certain stock option grants were used for financial accounting purposes." (AC ¶ 79 (internal quotation marks omitted).) On February 28, 2007, Take-Two filed its 2006 Form 10-K and its 2007 Proxy Statement, which restated Take-Two's financials for the period spanning April 1997 through October

2005 in order to account for $42.1 million in unrecorded compensation expenses on improperly-dated options. (AC ¶¶ 82, 99, 102.) The 2007 Proxy Statement also reported that directors who had received backdated options--including defendants Todd Emmel ("Emmel"), Robert Flug ("Flug"), Oliver Grace ("Grace"), Steven Tisch ("Tisch"), and Mark Lewis--had agreed to cancel or re-price approximately 196,000 improperly-dated options. (AC ¶¶ 83-84.) St. Clair alleges, however, that these cancellations and re-pricings barely scratched the surface of the underlying wrongdoing at Take-Two, which may have involved as many as 1 million stock options. (AC ¶¶ 84, 94, 96.) St. Clair also avers that three of Take-Two's executive officers pleaded guilty to crimes relating to the Options-Backdating Scheme, and that the Company may face criminal charges as well. (AC ¶ 81.)

### 3. Deficient Financial Controls

St. Clair claims that the Channel-Stuffing and Options-Backdating Schemes were possible in part because of material weaknesses in the Company's financial controls. (AC ¶ 132.) Indeed, although Take-Two represented in the 2002 Restatement that it had strengthened its internal controls (AC ¶ 132), St. Clair avers that the Company continued to engage in channel stuffing during the period from 2002 through 2004 (AC ¶¶ 133, 143, 156). Moreover, St. Clair alleges that the weaknesses in Take-Two's internal controls enabled several other improper

accounting practices, including, but not limited to, (1) overly aggressive revenue recognition and cost capitalization (AC ¶¶ 132, 142, 152); (2) inaccurate inventory management (AC ¶¶ 132, 142, 152); (3) the improper capitalization of software-development costs (AC ¶¶ 134, 144); (4) the understatement of write-offs, uncollectible accounts, returns, price concessions, discounts, and cooperative advertising (AC ¶¶ 142, 152, 158); (5) the improper classification of internal development costs as long-term development costs (AC ¶¶ 145, 154); and (6) the overstatement of goodwill (AC ¶ 157).

### 4. The Re-rating of GTA:SA

In addition to the financial and accounting manipulations outlined in the preceding sections, St. Clair further avers that Take-Two improperly marketed its leading video game, Grand Theft Auto: San Andreas ("GTA:SA"), under an inappropriate content rating. (AC ¶ 62.) The Entertainment Software Ratings Board (the "ESRB") is a self-regulatory body that "applies and enforces ratings, advertising guidelines, and online privacy principles adopted by the computer and video game industry." (AC ¶ 60.) When Take-Two submitted GTA:SA for rating prior to its public release in the fall of 2004 (AC ¶ 59), the Company failed to inform the ESRB that the game contained hidden, sexually explicit content (the "Sex Minigame") (AC ¶ 62). As a result, the ESRB assigned GTA:SA an "M" rating (AC ¶ 61), rather than

the more restrictive "Adults Only 18+" ("AO") rating, which
would have prevented the game from being sold in some large
retail outlets, including Wal-Mart and Target (AC ¶ 60).

In June 2005, a downloadable software program called the
Hot Coffee Mod became widely available, allowing GTA:SA users to
play the Sex Minigame. (AC ¶ 62.) Although the Company initially
denied that it had created the Sex Minigame (AC ¶ 65), on July
20, 2005, a spokesperson for Take-Two conceded that programmers
at Take-Two's subsidiary, Rockstar Games, Inc. ("Rockstar"), had
created the relevant content (AC ¶ 68). On that same day, the
ESRB announced that it would change GTA:SA's rating to AO on the
grounds that the Sex Minigame was present on the game's disc "in
a fully rendered, unmodified form." (AC ¶ 69.) The ratings
change prompted several large retailers, including Wal-Mart,
Best-Buy, and Target, to pull GTA:SA from their shelves. (AC ¶
70.) Thereafter, Take-Two lowered its net sales guidance for the
third fiscal quarter of 2005 from $170 million to $160 million,
and revised its guidance for the fiscal year 2005 from $1.31
billion to $1.26 billion. (AC ¶ 71.) On July 26, 2005, Take-Two
announced that the Federal Trade Commission (the "FTC") had
commenced an investigation into the advertising for GTA:SA. (AC
¶ 73.) On July 29, 2005, Take-Two disclosed that two consumer
class actions had been filed against the Company in connection
with the GTA:SA scandal (AC ¶ 74). Also on July 29, 2005,

Australia's Office of Film and Literature Classification revoked GTA:SA's classification, thereby foreclosing further advertising or sales of the game in Australia. (AC ¶ 74.) The events surrounding the re-rating of GTA:SA provoked a 13% decline in the value of Take-Two's stock between July 20, 2005, and July 26, 2005. (AC ¶ 75.)

**B. Procedural History of this Litigation**

St. Clair filed the original complaint (the "Complaint") in this matter on January 30, 2006. See 06 Cv. 688 (SWK), Dkt. No. 1. The Complaint advanced various claims arising out of the Channel-Stuffing Scheme (Compl. ¶¶ 33-43, 106), the re-rating of GTA:SA (Compl. ¶¶ 44-63, 110), and Take-Two's deficient internal controls (Compl. ¶¶ 65-83). On March 8, 2006, the Board established the SLC with one original member, Michael J. Malone ("Malone"), who had been named a Take-Two director in January 2006. On March 14 and March 24, 2006, respectively, John F. Levy ("Levy") and Grover C. Brown ("Brown") were appointed to the Board and named to serve on the SLC. Shortly thereafter, the SLC moved for a discovery stay, which the Court granted in an Opinion and Order filed on October 4, 2006. See St. Clair Shores Gen. Employees Ret. Sys. v. Eibeler, 06 Cv. 688 (SWK), 2006 WL 2849783 (S.D.N.Y. Oct. 4, 2006). On February 16, 2007, the SLC completed its Report, which concludes that the maintenance of

the instant litigation is not in Take-Two's best interests. <u>See</u> 06 Cv. 688 (SWK), Dkt. No. 44.

On the basis of that Report, the SLC moved to dismiss the instant litigation on March 23, 2007. 06 Cv. 688 (SWK), Dkt. Nos. 42-44. In response, St. Clair propounded various discovery requests concerning the SLC's investigation. In an Opinion and Order filed on October 17, 2007, the Court resolved certain outstanding discovery disputes, granting St. Clair's request to compel SLC member Malone to sit for a deposition, but denying St. Clair's request to view all documents reviewed by the SLC. <u>St. Clair Shores Gen. Employees Ret. Sys. v. Eibeler</u>, 06 Cv. 688 (SWK), 2007 WL 3071837, at *1 (S.D.N.Y. Oct. 17, 2007). Meanwhile, St. Clair filed an amended complaint (the "AC") on August 24, 2007. <u>See</u> 06 Cv. 688 (SWK), Dkt. No. 50. In addition to supplementing the Complaint's allegations regarding the Channel-Stuffing Scheme, Take-Two's deficient internal controls, and the re-rating of <u>GTA:SA</u>, the AC adds claims arising out of the Options-Backdating Scheme. The AC, like the Complaint, advances both derivative and direct claims against various former Take-Two officers and directors: Counts I through VI of the AC plead derivative claims (the "Derivative Claims"), while Counts VII through XI plead direct claims for relief (the "Direct Claims").

Count I alleges that various Take-Two officers and directors[1] breached fiduciary duties owing to the Company by engaging in insider trading while in possession of material, nonpublic information. (AC ¶¶ 56-58; 201-04.) In particular, St. Clair claims that these defendants sold hundreds of thousands of shares of Take-Two stock while in possession of information about the likelihood that the SEC would bring an enforcement action in connection with the Channel-Stuffing Scheme. (AC ¶ 203.)

Count II alleges that several of the Company's officers and directors[2] breached fiduciary duties owing to Take-Two by selling shares of the Company's stock while in possession of material, nonpublic information regarding the presence of the Sex Minigame in GTA:SA's code, and the likely effect of the Sex Minigame on the GTA:SA's rating and ultimate marketability. (AC ¶¶ 76-78; 207.) Count VI further alleges that Take-Two officers and directors[3] breached their fiduciary duties by allowing the

---

[1] These individuals include the Company's then-CFO Karl Winters ("Winters"), then-Chairman of the Board Ryan Brant ("Brant"), and then-directors Flug, Grace, and Mark Lewis. (AC ¶ 202; see also AC ¶¶ 20-22, 24, 26.)

[2] These individuals include Take-Two's then-CFO Winters, then-COO Gary Lewis, and then-directors Flug, Grace, Emmel, and Tisch. (AC ¶ 206; see also AC ¶¶ 19-21, 23, 25-26.)

[3] These individuals include the Company's then-President Paul Eibeler ("Eibeler"), and then-directors Emmel, Flug, Grace, Mark Lewis, and Tisch. (AC ¶ 225; see also AC ¶¶ 18-23.)

Company to submit GTA:SA to the ESRB without disclosing the presence of the Sex Minigame. (AC ¶¶ 225-26.)

Count III through V of the AC aver that various Take-Two officers and directors[4] violated Section 14(a) of the Securities Exchange Act (the "Exchange Act") and Rule 14a-9 thereunder by promulgating materially misleading proxy statements in order to secure shareholder approval of amendments to Take-Two's 2002 Stock Option Plan. (AC ¶¶ 210-23.) Counts III and IV allege that the 2003 and 2004 Proxy Statements failed to disclose material information concerning the Company's deficient internal controls, its improper capitalization of external development costs, and its ongoing perpetration of the Channel-Stuffing Scheme. (AC ¶¶ 211, 216.) Count V alleges that the 2005 Proxy Statement failed to disclose material information regarding these same matters, in addition to information concerning the evanescence of the Company's tax profits, the Company's overstatement of goodwill, its manipulation of discretionary account accruals, the reasons for the departure of the Company's

---

[4] With respect to Count III, these individuals include then-President Eibeler, then-Chairman of the Board Brant, then-CEO and director Jeffrey C. Lapin ("Lapin"), and then-directors Grace, Flug, Mark Lewis, Emmel, Tisch, and Richard Roedel ("Roedel"). (AC ¶ 210; see also AC ¶¶ 18-24, 27-28.) With respect to Count IV, they include then-President Eibeler, then-CEO and Chairman of the Board Roedel, and then-directors Emmel, Flug, Grace, Mark Lewis, and Tisch. (AC ¶ 215; see also AC ¶¶ 18-23, 28.) With regard to Count V, they include then-President and CEO Eibeler, and then-directors Emmel, Flug, Grace, Mark Lewis, and Tisch. (AC ¶ 220; see also AC ¶¶ 18-23.)

Chairman, Richard Roedel, and the presence of the Sex Minigame in GTA:SA's code. (AC ¶ 221.)

Counts VII and VIII of the AC aver that several Take-Two officers and directors[5] breached their fiduciary duty to the putative class by omitting from the 2001 and 2002 Proxy Statements that certain officers had received backdated options, which caused Take-Two to overstate its net income. (AC ¶¶ 229-236.) St. Clair claims that these omissions infringed putative class members' right to cast an informed vote (AC ¶¶ 231, 238), and caused an unwarranted dilution of putative class members' ownership interest through the addition of millions of shares to the Company's 1997 Stock Option Plan. (AC ¶¶ 232, 239.)

Counts IX through XI of the AC allege that various Take-Two officers and directors[6] breached fiduciary duties owing to the

---

[5] With respect to Count VII, these individuals include then-CEO Kelly Sumner ("Sumner"), then-President Eibeler, then-Chairman of the Board Brant, and then-directors Flug, Grace, and Mark Lewis. (AC ¶ 228; see also AC ¶¶ 18, 20-22, 24, 29.) With respect to Count VIII, they include then-CEO Sumner, then-President Eibeler, then-Chairman of the Board Brant, and then-directors Flug, Grace, Emmel, Mark Lewis, and Tisch. (AC ¶ 235; see also AC ¶¶ 18-24, 29.)

[6] With regard to Count IX, these individuals include then-President Eibeler, then-Chairman of the Board Brant, then-CEO and director Lapin, and then-directors Grace, Flug, Mark Lewis, Emmel, Tisch, and Roedel. (AC ¶ 242; see also AC ¶¶ 18-24, 27-28.) With regard to Count X, they include then-President Eibeler, then-CEO and Chairman of the Board Roedel, and then-directors Emmel, Flug, Grace, Mark Lewis, and Tisch. (AC ¶ 249; see also AC ¶¶ 18-23, 28.) With regard to Count XI, they include then-President and CEO Eibeler, and then-directors Emmel, Flug, Grace, Mark Lewis, and Tisch. (AC ¶ 256; see also AC ¶¶ 18-23.)

putative class by issuing the 2003, 2004, and 2005 Proxy Statements, which omitted information about the Options-Backdating Scheme and the information set forth in Counts III through V. (AC ¶¶ 243, 250, 257.) St. Clair claims that these materially misleading proxy statements violated putative class members' right to cast an informed vote (AC ¶¶ 246, 253, 260), and diluted putative class members' ownership interest through the addition of shares to Take-Two's Stock Option Plans (AC ¶¶ 245, 252, 259).

On September 24, 2007, the SLC filed a motion to dismiss the newly-pleaded claims set forth in the AC, and renewed its motion to dismiss those claims that initially appeared in the Complaint. See 06 Cv. 688 (SWK), Dkt. Nos. 57-61. The SLC's motions to dismiss are the subject of the instant Opinion.

## II. Discussion

"A special litigation committee has the power to terminate a derivative action to the extent allowed by the state of incorporation." Struogo v. Padegs, 27 F. Supp. 2d 442, 447 (S.D.N.Y. 1998) (citing Burks v. Lasker, 441 U.S. 471, 486 (1979)). Under the law of Delaware, Take-Two's state of incorporation, a special litigation committee may file a motion to dismiss derivative litigation based on its determination of the best interests of the corporation. See Zapata Corp. v.

<u>Maldonado</u>, 430 A.2d 779, 788 (Del. 1981). Courts employ a two-step process to evaluate such a motion.

First, courts must "inquire into the independence and good faith of the committee and the bases supporting its conclusions." <u>Id.</u> In conducting this inquiry, courts should apply the standard that governs motions for summary judgment. <u>Lewis v. Fuqua</u>, 502 A.2d 962, 966 (Del. Ch. 1985). Accordingly, the special litigation committee bears the burden of showing the absence of any genuine issue of material fact concerning the independence of the committee's members, the good faith of its investigation, and the reasonableness of the bases for its conclusions. <u>Kaplan v. Wyatt</u>, 484 A.2d 501, 507 (Del. Ch. 1984). Second, courts may, in their discretion, apply their own business judgment to determine whether derivative litigation is in the corporation's best interests. <u>Zapata</u>, 430 A.2d at 789.

Here, the SLC has conducted an investigation of the Derivative Claims and has concluded that their continued prosecution is not in Take-Two's best interests. Therefore, the SLC requests that the Court dismiss the Derivative Claims in conformity with the standards set forth above. Additionally, the SLC contends that the Direct Claims are actually derivative in nature. Consequently, the SLC asks the Court to dismiss the Direct Claims for failure to make a demand on the Board. For the reasons that follow, the SLC has persuaded the Court that the

Derivative Claims should be dismissed pursuant to <u>Zapata</u>. Nevertheless, the SLC has failed to show that the Direct Claims are subject to dismissal at this stage of the proceedings.

**A. The Derivative Claims Are Dismissed**

St. Clair challenges the independence of the SLC's members, the good faith of their investigation, and the reasonableness of the bases for their conclusions. Before addressing the independence, good-faith, and reasonableness factors, however, the Court must consider an antecedent issue. Under Delaware law, "the sole member of a one-person special committee [must] meet unyielding standards of diligence and independence." <u>Sutherland v. Sutherland</u>, Civ. A. 2399 (VCL), 2007 WL 1954444, at *3 n.10 (Del. Ch. July 2, 2007) (citations omitted). In the instant case, St. Clair contends that "Brown functioned as a one person committee investigating St. Clair's insider trading allegations and Levy functioned as a one person committee investigating St. Clair's accounting-based allegations," thereby necessitating stricter scrutiny of the SLC's request for dismissal. (Pl.'s Opp'n 12). The Court disagrees.

Brown testified that his investigation focused upon the AC's insider-trading allegations, which related to his legal training. (Pl.'s Opp'n, Declaration of Sidney S. Liebesman ("Liebesman Decl.") Ex. E, at 38.) Levy attested that his work concentrated on the AC's accounting-based allegations, which

fell within his area of expertise. (Liebesman Decl. Ex. F, at 80.) Nevertheless, Levy and Brown testified that they had spoken frequently, and exchanged updates and drafts of their work throughout the SLC's investigation. (Liebesman Decl. Ex. E, at 37, 39-40; Liebesman Decl. Ex. F, at 77.) Although Malone did not play an active role in the SLC's investigation (Liebesman Decl. Ex. G, at 130), Malone testified that he attended two meetings of the SLC (Liebesman Decl. Ex. G, at 48-49, 51), and that he had reviewed drafts of the SLC's work and commented thereupon (Liebeman Decl. Ex. G, at 130-32.) Given that Brown and Levy actively participated in generating the Report, and that Brown, Levy, and Malone exchanged drafts and comments throughout the SLC's investigation, they comprised a three-person special litigation committee. The Court finds no occasion or authority to specify further the particular roles individual committee members must play in order for the committee to be treated as a multimember entity.

Accordingly, in evaluating the independence, good-faith, and reasonableness factors, the Court will not apply the more stringent scrutiny owing to single-member committees. Moreover, as the following sections demonstrate, the SLC has carried its burden of showing the absence of a triable issue regarding the Committee's independence and good faith, and the reasonableness of its conclusions. Because the Court declines to exercise its

own business judgment to determine whether continued pursuit of the Derivative Claims is in Take-Two's best interests, the Court therefore dismisses the Derivative Claims.

## 1. The SLC's Members Are Independent

"[T]he question of independence turns on whether a director is, <u>for any substantial reason</u>, incapable of making a decision with only the best interests of the corporation in mind." <u>In re Oracle Corp. Derivative Litig.</u>, 824 A.2d 917, 938 (Del. Ch. 2003) (quotation marks and citation omitted). In assessing a special litigation committee's independence, courts "investigate[] the members' personal interest in the disputed transactions, and 'scrutinize[] the members' relationship with the interested directors.'" <u>Sutherland v. Sutherland</u>, Civ. A. 2399 (VCL), 2008 WL 1932374, at *3 (Del. Ch. May 5, 2008) (quoting <u>Katell v. Morgan Stanley Grp., Inc.</u>, Civ. A. 12343, 1995 WL 376952, at *8 (Del. Ch. Jun. 15, 1995)).

Here, the record evidence does not reveal that the SLC's members had any interest in the disputed transactions that the SLC investigated. Indeed, "[n]one of the SLC's members had any connection or affiliation with Take-Two prior to their appointment to the Board and the SLC" (Declaration of Grover C. Brown, Ex. A ("Report") 4), which occurred long after the acts alleged in the AC. Nevertheless, St. Clair argues that Malone's long-time friendship with one of the principal defendants to

this action deprived him of the necessary independence (Pl.'s Opp'n 14); that Levy "value[d] his position on the [Board] above candidly addressing the allegations of wrongdoing in this case" (Pl.'s Opp'n 13); and that all of the SLC's members fail Zapata's independence test insofar as they allowed their investigation to be curtailed by the dictates of Blank Rome, Take-Two's corporate counsel (Pl.'s Opp'n 14-16). In the sections that follow, the Court evaluates the independence of the SLC's members, especially in light of these contentions. Given the undisputed qualifications of the SLC's members, as well as their appointment to the Board and the SLC subsequent to the allegedly wrongful acts in question, the Court holds that there is no genuine issue of fact regarding their independence.

### a. Malone

Malone is the founder, and until recently, the Chairman, of a multi-million dollar music programming and distribution company with operations in thirty-eight countries. (Report 4.) He has an interest in several hotels and restaurants, and is the principal in a national hotel management company. (Report 4.) Malone owns and operates a national jet charter company based in Seattle. (Report 4.) He also owns and operates multiple commercial, residential, and development properties in the Seattle area. (Report 4.) Malone has served as a member or trustee of various charitable and public-interest organizations.

(Report 4-5.) Since 1998, he has also served on the board of directors and audit committee of an international freight forwarding company. (Report 5.) Therefore, Malone possesses a wealth of business and management experience relevant to his service upon the Board and the SLC. St. Clair contends, however, that Malone's relationship to defendant Grace undermines his independence.

Delaware law does not countenance "a reductionist view of human nature that simplifies human motivations on the lines of the least sophisticated notions of the law and economics movement. Homo sapiens is not merely homo economicus." In re Oracle Corp., 824 A.2d at 938. Accordingly, courts evaluating a director's purported independence should consider the full gamut of human motivations. Id. (acknowledging that human conduct may be motivated by "greed or avarice, . . . envy, . . . love, friendship, and collegiality"). The independence inquiry ultimately turns on whether, in light of the totality of the circumstances, a given director can base his decision on "the merits of the issue rather than being governed by extraneous consideration or influences." Kaplan v. Wyatt, 499 A.2d 1184, 1189 (Del. 1985) (citing Aronson v. Lewis, 473 A.2d 805 (Del. 1984)).

Here, Malone acknowledges that one of the defendants, Grace, "has been a friend for many years" (Liebesman Decl. Ex.

G, at 15), and that it was Grace who first contacted him about serving on Take-Two's Board (Liebesman Decl. Ex. G, at 18-22). Nevertheless, because Malone was appointed to the Board on January 25, 2006 (AC ¶ 30)--before the instant suit was filed on January 30, 2006, see 06 Cv. 688 (SWK), Dkt. No. 1, and before the SLC was created on March 8, 2006 (Report 2)--there are no grounds to conclude that Malone was appointed in order to immunize his friend from liability. Moreover, Malone's departure from the Board after the SLC had completed its work is no reason to infer that he stayed just long enough to vindicate his friend's interests. Malone testified that he did not join the Board with the understanding that his role would be temporary or for a specific purpose. (Liebesman Decl. Ex. G, at 138-39.) Malone decided that he would terminate his relationship with Take-Two after fulfilling his obligations to the SLC, largely because he came to realize that he was not interested in the work he was being asked to perform. (Liebesman Decl. Ex. G, at 137-38.) In light of the foregoing, the circumstances of Malone's appointment to the SLC do not suggest that he lacked the necessary independence. Malone's ties to Grace--which apparently consisted largely of occasional squash matches (Liebesman Decl. Ex. G, at 15)--fail to create a triable issue concerning Malone's independence. See Beam v. Stewart, 845 A.2d 1040, 1051 (Del. 2004) ("Allegations that Stewart and the other

directors moved in the same social circles, attended the same weddings, developed business relationships before joining the board, and described each other as 'friends,' even when coupled with Stewart's 94% voting power, are insufficient, without more, to rebut the presumption of independence."); see also In re Sonus Networks, Inc., S'holder Derivative Litig., 499 F.3d 47, 67-68 (1st Cir. 2007) (describing "demanding" standard by which allegations of lack of independence due to friendship are evaluated); In re Verisign, Inc. Derivative Litig., 531 F. Supp. 2d 1173, 1197 (N.D. Cal. 2007) (same).[7]

### b. Levy

Levy is the CEO of a consulting firm that advises public companies on issues of corporate governance and compliance, financial reporting, and financial strategies. (Report 5.) Levy has nearly thirty years of accounting experience and has served as CFO for both public and private companies for over thirteen years. (Report 5.) He is a certified public accountant with nearly a decade of experience working for major national public

---

[7] Although these cases arose in the context of a shareholder's assertion of demand excusal, which throws upon the plaintiff the burden of alleging facts that give rise to a reasonable doubt as to a director's independence, see, e.g., Stewart, 845 A.2d at 1050, their treatment of director independence is nonetheless relevant to the present context, in which the SLC bears the burden of proving its own independence, see, e.g., In re Oracle, 824 A.2d at 938-39 (citing cases involving demand excusal and noting that formula for evaluating independence of special litigation committees is consistent with that which pertains in demand excusal cases).

accounting firms. (Report 5.) Levy is also qualified as a financial expert under the SEC's rules. (Report 5.) He earned a BS with a major in accounting at the Wharton School of the University of Pennsylvania, and received his MBA from St. Joseph's University in Philadelphia. (Report 5.) He is also the co-author of Cashin's Handbook for Auditor's, 2d Edition. (Report 5.) Accordingly, Levy possesses ample qualifications to evaluate the AC's accounting-based allegations, the task that constituted the bulk of his work for the SLC. (Liebesman Decl. Ex. E, at 37-40, 142; Ex. F, at 77.)

Furthermore, the record evidence does not support St. Clair's contention that Levy valued his position on the Board more than his duty to investigate fully the Derivative Claims. There is nothing untoward in Levy's testimony that he had not addressed the Hot Coffee Mod in any detail during his interview for his Board position because "it was partly a job interview. You're trying to impress the people and put your best foot forward." (Pl.'s Opp'n 13 (quoting Liebesman Decl. Ex. F, at 26-28).) Notwithstanding St. Clair's protestation to the contrary, Levy was under no duty to interrogate Board members about the Hot Coffee Mod before he had earned a spot on the Board or the SLC. As Levy stated in his deposition, the purpose of his interview was to explore what he could do to benefit the Company as one of its directors, rather than to probe the details

surrounding the release of the Hot Coffee Mod. (Liebesman Decl. Ex. F, at 27-28.)

St. Clair's citation to Levy's effort to secure business for one of the defendant directors (Pl.'s Opp'n 13) is similarly unavailing. The record reveals that Levy encouraged a business associate to meet with Grace, but did so only after the SLC had completed its Report and Grace had left the Board. (Liebesman Decl. Ex. F, at 31.) In the absence of further evidence of an existing relationship between Levy and Grace during the SLC's investigation, this stray business contact does not undermine Levy's independence. Cf. Stewart, 845 A.2d at 1051 (noting, inter alia, that mere existence of business relationships between defendant director and other directors did not undermine other directors' independence).[8] In short, the record provides no grounds to speculate either that Levy was appointed to do the interested directors' bidding, or that he would have accepted an appointment of that kind. See Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc., Civ. A. 13950, 1997 WL 305829, at *11 (Del. Ch. May 30, 1997).

### c. Brown

Brown is an attorney and member in good standing of the Bar of the State of Delaware. (Report 6.) He served for fourteen years on the Delaware judiciary, including twelve years as a

---

[8] See supra note 7.

member of the Delaware Court of Chancery. (Report 6.) Brown was Vice-Chancellor for the State of Delaware from 1973 to 1982, and Chancellor from 1982 to 1985. (Report 6.) He also sat by special designation on the Delaware Supreme Court, hearing over 100 appeals. (Report 6.) Brown authored several important decisions in the area of corporate law, including Kaplan v. Wyatt, 484 A.2d 501 (Del. Ch. 1984), which fleshed out the standards by which courts would evaluate special litigation committees established under the Zapata framework. Since his return to private practice in 1985, Brown has, inter alia, served as counsel to special litigation committees and assisted in the conduct of their investigations and preparation of final reports. (Report 6.) Given his legal background, Brown was eminently qualified to consider the AC's insider-trading allegations, which formed the crux of his work for the SLC (Liebesman Decl. Ex. E, at 38), and to serve as the Committee's chairman (Liebesman Decl. Ex. E, at 63).

St. Clair has not offered, nor does the record reveal, any reason to conclude that Brown possessed ties to interested directors or to the subject matter of this suit that might undermine his independence.

### d. Blank Rome's Alleged Curtailment of the SLC's Work

Blank Rome served as outside counsel to Take-Two concerning several subject matters that bear upon this litigation. (See,

e.g., Liebesman Decl. Ex. E, at 54, 58-59.) The firm continued to serve in that capacity until February 2007, when a new slate of directors brought in new management and new outside counsel. (See Liebesman Decl. Ex. F, at 297.) In addition, the Board contemplated the possibility that Blank Rome would represent certain individual defendants to this action. (See Liebesman Decl. Ex. E, at 89-90; Liebesman Decl. Ex. F, at 265-66.) Notwithstanding Blank Rome's ties to Take-Two, and perhaps, to the individual defendants, both Levy and Brown testified that they relied upon the firm for the production of certain documents relevant to their investigation. (See, e.g., Liebesman Decl. Ex. F, at 46-47, 55, 58-59, 69, 82-84; Liebesman Decl. Ex. E, at 51-52, 55-56, 58-59, 88, 95.) St. Clair contends that the SLC's reliance on Blank Rome destroys the SLC's independence. (Pl.'s Opp'n 15.) For the reasons that follow, the Court disagrees.

The mere fact that corporate counsel may have assisted a special litigation committee in gathering information relevant to its investigation does not, by itself, negate the committee's independence. Cf. Kaplan, 484 A.2d at 519 ("While it seems to me that it would be better if such a practice was avoided, I cannot find from the bare circumstance relied on by the plaintiff, without more, that the scheduling of Committee interviews by members of corporate management and the attendance of corporate

house counsel at the Committee interviews of corporate employees warrants a finding that the Special Litigation Committee was not independent of those in charge of the corporation during the conduct of its investigation."). That fact, however, should be considered as part of the totality of circumstances bearing upon committee members' independence.

Here, Levy testified that he obtained various documents from sources other than Blank Rome, such as government records and members of Take-Two's management. (Liebesman Decl. Ex. F, at 43-44, 59-60, 70, 224-25, 234.) In addition, Levy identified seven individuals whom he had personally interviewed in connection with his work. (Liebesman Decl. Ex. F, at 95.) Brown testified that he had obtained documents from sources other than Blank Rome, including the firms of Boies, Schiller & Flexner LLP ("Boies Schiller") and Sullivan & Cromwell LLP ("Sullivan & Cromwell"). (Liebesman Decl. Ex. E, at 53.) Brown also asserted that he or his attorneys had personally interviewed most of the defendants, with the exception of Ryan Brant ("Brant") and Gary Lewis,[9] and that he had spoken to the head of the ESRB, Patricia

---

[9] St. Clair claims that Brown did not interview Tisch and Emmel. (Pl.'s Opp'n 20 & n.8.) Nevertheless, Brown testified that the SLC had interviewed all of the defendants other than Brant and Gary Lewis. (Liebesman Decl. Ex. E, at 43.) Brown also stated, "I think Todd Emmel, we arranged for him--I think my second attorney along the way spoke to both him and maybe Mr. Tisch." (Liebesman Decl. Ex. E, at 101.) Moreover, the SLC

Vance ("Vance"), as well. (Liebesman Decl. Ex. E, at 43-44, 99-100.) Accordingly, the record makes abundantly clear that the SLC did not rely solely upon Blank Rome as a conduit to the information it sought. In addition, Brown stated that he took special precautions to prevent Blank Rome from sitting in on interviews and other investigative work conducted by the SLC. (Liebesman Decl. Ex. E, at 93-94, 97.)

Moreover, Brown stated his understanding that Blank Rome had provided the SLC with all the relevant documentation within its possession (Liebesman Decl. Ex. E, at 62, 70-71), while Levy attested that the SLC had acquired everything it needed from Blank Rome (Liebesman Decl. Ex. F, at 194). Although Brown testified that it "took some time to get things out of the Blank Rome firm" (Liebesman Decl. Ex. E, at 51), he stated that Blank Rome had not denied any of his specific requests for documents (Liebesman Decl. Ex. E, at 57). Furthermore, though Brown stated that he had discovered in Blank Rome's offices ten boxes of materials that the firm previously had failed to turn over (Liebesman Decl. Ex. E, at 56-57), he also stated that he did not believe that Blank Rome had done anything to hamper the investigation (Liebesman Decl. Ex. E, at 61-62). Accordingly,

---

stated unequivocally in its Report that it had interviewed Tisch and Emmel. (Report 49.)

the SLC was satisfied with the cooperation offered by Blank Rome.

The record also reveals that Blank Rome did not represent the individual defendants to this action in connection with the investigative work performed by the SLC. Although the Board empowered the SLC to waive conflicts that might have arisen from Blank Rome's representation of the individual defendants (Liebesman Decl. Ex. F, at 265), Levy testified that the defendants had already retained Sullivan & Cromwell to represent them before he had joined the Board and the SLC (Liebesman Decl. Ex. F, at 265-66). Therefore, before the SLC had commenced its work, the defendants had retained counsel other than Blank Rome, and any conflict resulting from Blank Rome's representation of the defendants never materialized.[10]

Brown attested that he requested documents from Blank Rome because he was told that the firm possessed the relevant documentation. (Liebesman Decl. Ex. E, at 53, 54, 88, 95.) Likewise, Levy asserted that he relied upon Blank Rome in his review of the AC's channel-stuffing allegations because the firm had performed a detailed investigation of that subject. (Liebesman Decl. Ex. F, at 233.) Special litigation committees

_____

[10] In any event, the mere existence of a conflict arising from Blank Rome's representation of the defendants would not have destroyed the SLC's independence, though it might have borne upon the reasonableness of the SLC's reliance upon Blank Rome's disclosures.

must acquire information relevant to their investigations from the sources that possess such information. In the instant case, Blank Rome was evidently one such source. Although St. Clair contends that Blank Rome was hostile to the SLC's investigation because the firm was beholden to the defendant directors (Pl.'s Opp'n 15), Blank Rome represented Take-Two, which had empowered the SLC to perform its investigation. There was every reason to expect that Blank Rome would cooperate with the investigation ordered by its client. In any event, special litigation committees often must gather information from potentially hostile sources, including the corporation itself, as well as individuals who are the subject of the underlying investigation.

The SLC acquired the documents it needed from various sources, including Blank Rome. (Liebesman Decl. Ex. F, at 194.) In addition, the SLC took steps to ensure that it alone controlled the direction of the investigation, without interference from outside parties, such as Blank Rome. (Liebesman Dec. Ex. E, at 93-94.) Although the SLC solicited feedback from Blank Rome and Take-Two management concerning its recitation of the facts in the Report (Liebesman Decl. Ex. E, at 168-69; Liebesman Decl. Ex. F, at 51-52), such feedback consisted largely in the notation of grammatical or minor factual errors (Liebesman Decl. Ex. F, at 52; Liebesman Decl. Ex. E, at 75, 169). The SLC did not make its conclusions or

recommendations known to these entities or individuals before it had issued the Report. (Liebesman Decl. Ex. E, at 168; Liebesman Decl. Ex F, at 52.) Furthermore, no one at Take-Two or elsewhere attempted to influence the conclusions drawn or recommendation made by the SLC. (Liebesman Decl. Ex. E, at 76.) In light of the foregoing, the SLC did not lack independence merely because of its purported reliance upon Blank Rome during its investigation.

Accordingly, the Court holds that there is no genuine issue regarding the independence of the individual SLC members or of the SLC as a whole.

### 2. The SLC Acted in Good Faith

"[T]he touchstone of good faith in the context of a special litigation committee report is its demonstrated willingness to deal openly and honestly with all relevant and material information." Sutherland v. Sutherland, Civ. A. 2399 (VCL), 2008 WL 2221770, at *3 (Del Ch. May 29, 2008); see also In re Walt Disney Co. Derivative Litig., 907 A.2d 693, 755 (Del.Ch. 2005) ("To act in good faith, a director must act at all times with an honesty of purpose and in the best interests and welfare of the corporation."); Black's Law Dictionary 693 (6th ed. 1997) ("[Good faith] is ordinarily used to describe that state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking, means being faithful to one's duty or obligation.") (citation omitted). "The Court's focus in this

area is intertwined with its analysis of whether the SLC conducted a reasonable investigation." Struogo, 27 F. Supp. 2d at 451 (citation omitted). Here, Brown testified that the SLC carried out its charge "[t]o do a thorough investigation of the . . . derivative allegations, and to find all the facts that could reasonably be obtained that had a bearing on that and make a decision on behalf of the company as to what was best with respect to the litigation." (Liebesman Decl. Ex. E, at 75.) Nevertheless, St. Clair has raised a litany of challenges to the SLC's good faith.

First, St. Clair contends that the SLC gave first priority to the options-backdating claims it was investigating in connection with separate litigation. (Pl.'s Opp'n 16-17.) Second, St. Clair charges that the SLC failed to interview key potential witnesses. (Pl.'s Opp'n 17-18, 20.) Third, St. Clair claims that the SLC acquiesced in substantial limitations placed upon its investigatory work by Blank Rome, Take-Two's general counsel, and defendant Brant. (Pl.'s Opp'n 18-20.) Fourth, St. Clair argues that the SLC prejudged the merits of its derivative claims. (Pl.'s Opp'n 3.) For the reasons that follow, St. Clair's broadside attacks lack merit. Moreover, after reviewing the Report and the deposition testimony of the SLC's members, the Court holds that the SLC has amply demonstrated that it acted in good faith.

Levy testified that his investigation of the AC's allegations was "essentially put on hold" during the summer of 2006 while he investigated options-backdating claims advanced in separate litigation. (Liebesman Decl. Ex. F, at 275.) As a result, though the SLC was formed in March 2006 (Liebesman Decl. Ex. F, at 281), Levy "didn't really start up again on the accounting issues until September and really didn't work hard to conclude [his] investigation until December" (Liebesman Decl. Ex. F, at 276). Nevertheless, Brown attested that he worked on the SLC's investigation through the summer of 2006. (Liebesman Decl. Ex. E, at 42; see also Liebesman Decl. Ex. F, at 276.) Moreover, Brown estimated that he had first requested documents from Blank Rome in April 2006 (Liebesman Decl. Ex. E, at 63), though he did not receive the lion's share of Blank Rome's production until some time in August (Liebesman Decl. Ex. E, at 66-67). As such, the SLC--in the person of Brown--actively pursued its investigation of this litigation during the spring and summer of 2006, despite its concurrent obligation to review unrelated options-backdating claims. Further, the mere fact that the SLC had a duty to investigate claims other than those arising in this litigation is no reason to conclude that the SLC prioritized such other claims, or that the SLC failed to act in good faith.

The SLC did not interview Brant during its investigation. (Liebesman Decl. Ex. E, at 104; Liebesman Decl. Ex. F, at 116-17.) Brown testified that he did not interview Brant in relation to the insider-trading claims largely because Brant was in ill health and his testimony was unnecessary. (Liebsman Decl. Ex. E, at 104-17.) Brown stated that he "didn't find it critical in deciding what was in the best interest of the corporation with respect to this suit to try and interview Ryan Brant." (Liebesman Decl. Ex. E, at 114.) Likewise, Levy testified that Brant's testimony was unnecessary because the available documentary evidence resolved any issues that Brant might have clarified. (Liebesman Decl. Ex. F, at 116-17.) Although the SLC interviewed Brant in connection with separate options-backdating litigation (Liebesman Decl. Ex. F, at 113-16), Brown attested that the SLC "needed [Brant] more on the stock option thing than on this" (Liebesman Decl. Ex. E, at 104).

The SLC did not interview other potential witnesses identified by St. Clair because their testimony was also deemed unnecessary. For example, Brown stated that he did not interview defendant Gary Lewis because the latter was in Europe and his testimony "wasn't going to sway anything." (Liebesman Decl. Ex. E, at 102.) Moreover, although the SLC did not interview Rockstar employees to determine when they informed the defendants of the Sex Minigame (Liebesman Decl. Ex. F, at 245-

46), the SLC reviewed relevant correspondence and Board meeting minutes to determine when that information first reached Take-Two (Liebesman Decl. Ex. F, at 245). Indeed, Brown's paralegal, Gena DiSabatino ("DiSabatino"), prepared detailed summaries of the e-mails relating to the Sex Minigame that were exchanged by Rockstar personnel. (Liebesman Decl. Ex. E, at 152; Liebesman Decl. Ex. F, at 77; see also Report 39-49, 52.) Further, Levy testified that he did not interview members of the PricewaterhouseCoopers ("PwC") audit engagement team because he "didn't see any need for it." (Liebesman Decl. Ex. F, at 92.) Although Take-Two dismissed PwC as company auditor after PwC had refused to certify the effectiveness of Take-Two's internal controls (see Liebesman Decl. Ex. F, at 198, 206), PwC stated that it had not been dismissed as a result of a disagreement over the internal controls issue (Liebesman Decl. Ex. F, at 207-08), thereby obviating the need to interview PwC regarding its dismissal.

The SLC performed extensive interviews of key witnesses (Report 19-20; Liebesman Decl. Ex. F, at 95) and, as the foregoing discussion indicates, offered ample justification for its decision to forego interviews of other potential witnesses identified by St. Clair. Accordingly, the SLC's decisions regarding whom it would interview provide no reason to doubt the Committee's good faith.

The same conclusion applies with respect to St. Clair's allegation that the SLC accepted unreasonable limitations on its investigation. As the Court indicated supra, Part II.A.1.d, Levy and Brown testified that they relied upon Blank Rome for the production of certain documents relevant to their investigation. (See, e.g., Liebesman Decl. Ex. F, at 46-47, 55, 58-59, 69, 82-84; Liebesman Decl. Ex. E, at 51-52, 55-56, 58-59, 88, 95.) Nevertheless, Brown stated that the SLC was "not prohibited from making an independent request of documents from the company," but rather, that it relied upon Blank Rome to produce certain documents because the firm, not Take-Two, was in possession of the same. (Liebesman Decl. Ex. E, at 98-99.) Thus, insofar as the SLC "accepted limitations" on its investigation by soliciting information from Blank Rome, those limitations were dictated by the reality of the situation, i.e., the fact that Blank Rome possessed the relevant information.

St. Clair's contentions regarding the SLC's failure to review pertinent documents are similarly unavailing. Though St. Clair faults the SLC for relying solely on Forms 4 in its investigation of the insider-trading claims (Pl.'s Opp'n 19), the SLC consulted thousands of pages of documents--including Board minutes, e-mail transmissions, and interview notes prepared by Rockstar's counsel, Boies Schiller (Report 37, 52)-- in connection with its insider-trading investigation. Brown

testified that he did not acquire copies of the testimony given by Rockstar employees before the FTC because that testimony was not transcribed or recorded. (Liebesman Decl. Ex. E, at 52.) Further, although Levy relied upon public documents in considering St. Clair's accounting claims (Liebesman Decl. Ex. F, at 117), he also consulted minutes from Board and committee meetings (Liebesman Decl. Ex. F, at 83-84), materials prepared by PwC (Liebesman Decl. Ex. F, at 88), and schedules and binders prepared by Take-Two (Liebesman Decl. Ex. F, at 224-30). Given the wealth of documentary evidence consulted by the SLC, the Court sees no cause to doubt the committee's good faith on that ground.

Additionally, St. Clair's claims that the SLC prejudged the merits of its claims (Pl.'s Opp'n 3) are not supported by the record evidence. St. Clair cites the following language from a letter by Brown to an attorney at Sullivan & Cromwell, which represented the defendants:

> "It would be nice to establish while we are at it that these sales had nothing to do with their prior knowledge as to when the settlement was reached and about when the judgment would be entered. That was not information generally available to the investigating public."

(Liebesman Decl. Ex. E, at 77-78). Brown testified that, in penning this letter, he did not presuppose the facts, but rather, intended only to convey to the defendants what topics

the SLC intended to address in their interviews. (Liebesman Decl. Ex. E, at 78). Undoubtedly, Brown could have used different language to express this intention. Nevertheless, in light of the totality of the record, the Court finds no reason to doubt Brown's sincerity in asserting that his goal was "[t]o make a thorough investigation, make a report, give a good-faith recommendation as to what appeared to be in the best interest of the corporation." (Liebesman Decl. Ex. E, at 76.) Moreover, although St. Clair faults the SLC for previewing the topics it would cover during the defendants' interviews (Pl.'s Opp'n 3), the Court views this as a reasonable, time-saving tack, rather than as an indicium of bad faith.

The SLC requested and received some 18,000 pages of material from Blank Rome. (Report 19; Liebesman Decl. Ex. E, at 43.) It reviewed e-mails, minutes from Board and committee meetings, materials prepared by Take-Two's former auditor, PwC, memoranda and documents maintained by Boies Schiller and Sullivan & Cromwell, and schedules and binders prepared by Take-Two. The SLC also interviewed nearly all of the defendants to this action, several members of Take-Two's management, and the head of the ESRB, Vance. Additionally, the SLC retained competent counsel to assist in its investigatory work.[11] After

---

[11]  The SLC was initially represented by Young Conaway Stargatt & Taylor LLP. <u>See</u> 06 Cv. 688 (SWK), Dkt. No. 32.

completing its investigation, the SLC produced a report spanning eighty-eight pages, which thoroughly evaluates St. Clair's substantive claims. Under these circumstances, there is no genuine issue regarding the SLC's good faith in conducting its investigation. See Struogo, 27 F. Supp. 2d at 453 (holding that SLC's report, as well as quantity and quality of witnesses interviewed and documents reviewed, demonstrated that SLC had performed reasonable investigation and thus, demonstrated its good faith).

### 3. There Are Reasonable Bases for the SLC's Conclusions

In assessing whether there are reasonable bases for the SLC's conclusions, "the Court does not take an independent look at the merits of [the] lawsuit, but must find that the [SLC's] consideration of the merits of the claims was reasonable." Katell, 1995 WL 376952, at *12 (citation omitted). As such, the Court focuses not so much on "the facts and circumstances relating to the plaintiff's allegations of wrongs to the corporation," but rather, on "the conduct and activity of the [SLC] in making its evaluation of the factual allegations and contentions contained in the plaintiff's complaint." Kaplan, 484

Kasowitz, Benson, Torres & Freidman LLP ("Kasowitz") later substituted as counsel of record (Liebesman Decl. Ex. E, at 127-30), only to be replaced by Wolf, Block, Schorr & Solis-Cohen LLP, see 06 Cv. 688 (SWK), Dkt. No. 40, because Take-Two's insurance did not cover Kasowitz (Liebesman Decl. Ex. E, at 133-34).

A.2d at 519. The SLC can satisfy its burden of showing that there is no genuine issue concerning the reasonableness of its conclusions only by relying on information or evidence whose existence is not in dispute. <u>Katell</u>, 1995 WL 376952, at *12. Nevertheless, the SLC need not demonstrate that there is no genuine issue regarding the veracity or validity of the plaintiff's allegations. <u>Kaplan</u>, 484 A.2d at 519.

The SLC ultimately concluded that "continued pursuit of [the Derivative Claims] is not in the best interests of Take-Two and it[s] shareholders . . . ." (Report 88.) With respect to the insider-trading allegations in Counts I and II of the AC, the SLC found that there was essentially no possibility that Take-Two could sustain a monetary judgment against the defendants. (Report 36, 52.) With respect to the accounting allegations in Counts III, IV, and V, the SLC maintained that, although there might "be disagreements as to the propriety of the accounting treatment employed by the Company as to certain matters," such disagreements do not "rise to the level, either as a matter of fact or law under relevant precedents of proxy statement disclosure violations, to warrant the continuation of the litigation." (Report 87.)[12] There is no material dispute

---

[12] The Report does not address Count VI of the AC because its specific substantive charge did not appear in the original Complaint. Nevertheless, the SLC argues that the Report, which determined that the persons charged in Count VI did not have

concerning the steps the SLC took in order to reach these conclusions, _i.e._, the witnesses it interviewed, the documents it reviewed, and the manner in which it drafted and edited the Report. St. Clair contends, however, that these investigatory steps were inadequate.[13] (Pl.'s Opp'n 22-34.) The Court disagrees.

### a. Count I (Insider Trading Before Issuance of Wells Notice)

With respect to Count I, the SLC "found nothing in the thousands of pages of documents reviewed, in the minutes of the Board, or in its interviews [of the pertinent defendants other than Brant] to indicate that these defendants" possessed information suggesting that an SEC enforcement action would be forthcoming. (Report 37, 33-35.) The SLC also "found nothing to indicate that counsel representing the Company in connection with the SEC investigation at any point ever advised the Board or management . . . that an enforcement action by the SEC was a certainty." (Report 37.) The SLC further determined that the

---

knowledge of the existence of the Sex Minigame before the Hot Coffee Mod was developed (Report 51-54), forecloses liability on Count VI as well. (Mot. Dismiss / Consolidate 12.)

[13] At one point, St. Clair also contends that "the SLC has no credible, undisputed facts on which to base its conclusion that the probability of success on this claim is 'virtually nil.'" (Opp'n 24.) This contention is not well-taken, however, because the SLC need not show the absence of material facts regarding St. Clair's underlying claims, but only the absence of material facts concerning its investigation. Kaplan, 484 A.2d at 519.

timing of the defendants' alleged insider sales--which occurred fifteen to eighteen months after public disclosure that the SEC would conduct a formal private investigation, and three to six months before the SEC issued its Wells Notice--did not support a claim for insider trading. (Report 31, 36-37.) See, e.g., In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 279 (S.D.N.Y. 2008) ("The lapsing of nearly three months between Take-Two's issuance of the alleged false statement and the lion's share of Winters's stock sales, and of approximately four months between these substantial sales and the revelation of the alleged falsity, inescapably attenuates any inference of scienter that may be drawn in Lead Plaintiffs' favor."). In light of the sources of information that the SLC evidently consulted, and given what those sources revealed, the SLC undoubtedly possessed reasonable bases to conclude that there was little chance Take-Two could succeed on the merits of Count I.

### b. Count II (Insider Trading Before Hot Coffee Mod)

With regards to Count II, the SLC "found nothing to indicate that defendants [Karl] Winters, Gary Lewis, Flug, Grace, Emmel[,] and Tisch were aware that the sexual material so cherished by the Rockstar game developers was embedded on the game disc . . . until it became disclosed to them on or after July 15, 2005." (Report 52-53.) The SLC determined that the Sex

Minigame was designed and placed upon the GTA:SA game disc by Rockstar employees, "without the knowledge of any member of Take-Two's management who might have had a duty to report it to the Board." (Report 53.) The SLC based its conclusions in this respect upon: (1) its review of (a) Rockstar employees' e-mail records, (b) voluminous documents provided by the Company, and (c) interview notes prepared by Rockstar's counsel, Boies Schiller, in connection with its investigation of the Hot Coffee Mod; and (2) interviews of (a) the head of the ESRB, Vance; (b) the Company's President and CEO, Paul Eibeler; (c) the Company's lead outside counsel at Blank Rome, Robert Mittman; and (4) the individual defendant officers and directors.[14] (Report 52.) The SLC also noted that neither the FTC nor the SEC investigations relating to the Hot Coffee Mod had resulted in a fine, penalty, or charges against Take-Two, or members of its Board or management, a fact that bolstered the SLC's conclusions regarding Count II's lack of merit. (Report 54.)

St. Clair faults the SLC for failing to interview members of Rockstar's management, as well as defendant Brant, who acted as a liaison between Take-Two and Rockstar during the relevant period of time (Liebesman Decl. Ex. F, at 119), and knew of the Sex Minigame before members of the Board had learned of it

---

[14] Brown clarified in his deposition that the SLC never interviewed defendant Gary Lewis. (Liebesman Decl. Ex. E, at 102.)

(Liebesman Decl. Ex. E, at 108-09). (Pl.'s Opp'n 24-25.) Although these interviews may have yielded information relevant to the SLC's investigation, their absence does not deprive the Committee of reasonable bases for its conclusions. The SLC reviewed relevant correspondence and Board meeting minutes to determine when Rockstar first informed Take-Two employees of the Sex Minigame. (Liebesman Decl. Ex. F, at 245.) Brown's paralegal, DiSabatino, prepared detailed summaries of e-mails relating to the Sex Minigame that were exchanged by Rockstar personnel. (Liebesman Decl. Ex. E, at 152; Liebesman Decl. Ex. F, at 77; see also Report 39-49, 52.) Under these circumstances, the SLC had reasonable bases to conclude that Take-Two would not succeed on Count II, even though the SLC did not interview members of Rockstar's management and defendant Brant. Indeed, the Court finds it odd that St. Clair criticizes the SLC for failing to interview these individuals, while at the same time questioning the value of interviewing those involved in the charged wrongdoing (see, e.g., Pl.'s Opp'n 24, 26).[15]

### c. Counts III, IV, and V (Accounting Irregularities in 2003, 2004, and 2005 Proxy Statements)

With respect to the alleged proxy violations in Counts III, IV, and V, the SLC concluded that "there is no indication of

---

[15] Although Count II does not name Brant or members of Rockstar's management as defendants, Brant is named in other Counts, and Rockstar's management was partially responsible for the Sex Minigame (see, e.g., Liebesman Decl. Ex. E, at 151-58).

anything having been brought to the attention of the defendant directors that they would have had a duty to disclose, but did not, in the 2003, 2004[,] and 2005 proxy statements." (Report 87.) The Report discusses at length the individual accounting irregularities alleged in the AC, and determines either that there is no basis to impugn Take-Two's accounting, or that any irregularities identified are immaterial. (Report 59-86.) In reaching its conclusions, the SLC reviewed Take-Two's relevant public filings and other accounting-related documents maintained by the Company, including materials prepared by Take-Two's outside counsel and its independent auditors, and interviewed members of Take-Two's senior accounting management. (Report 58-59.)

St. Clair has presented a detailed criticism of the SLC's methods and conclusions (Pl.'s Opp'n 26-34), based largely on the testimony submitted by its accounting expert, Morris I. Hollander (see Pl.'s Opp'n, Affidavit of Morris I. Hollander ("Hollander Aff.")). In the sections that follow, the Court finds that St. Clair's criticisms are largely without merit, and holds that the SLC possessed reasonable bases for its conclusions regarding Counts III, IV, and V.

### (1)     The Channel-Stuffing Scheme

The crux of St. Clair's criticism of the SLC's channel-stuffing investigation is that the Committee failed to employ

various tests described by St. Clair's accountant. (Pl.'s Opp'n
27-28.) Although these procedures (see, e.g., Hollander Aff. ¶
8) may indeed assist in the preparation of a thorough, channel-
stuffing investigation, the SLC's failure to adopt such
procedures is not fatal. In evaluating St. Clair's allegations,
the SLC relied upon Blank Rome's in-depth investigation of
previous incidences of channel stuffing in 2000 and 2001.
(Report 70.) The SLC determined that Blank Rome's investigation
resulted in the implementation of at least twenty-three reforms
designed to prevent future incidences of channel stuffing.
(Report 71-72.) The SLC also reviewed a schedule of Take-Two's
quarterly returns and gross sales from January 31, 1999, to
April 30, 2006, as well as a memorandum prepared by management
to address unusual fluctuations in return rates. (Report 72.)
The SLC determined that any "variations in return rates were
supportable and reasonable." (Report 73.) In light of the
foregoing, the Committee possessed reasonable bases for its
conclusion that "there is no indication of [channel stuffing]
during the years ended October 31, 2002, 2003[,] and 2004"
(Report 73).

### (2)    Internal Control Deficiencies

St. Clair faults the SLC for relying too heavily upon PwC's
Auditor's Management Letters in investigating the AC's
allegations of internal control deficiencies. (Pl.'s Opp'n 29-

30.) These Letters summarized PwC's review of Take-Two's internal controls for the fiscal years ended October 31, 2002, 2003, and 2004. (Liebesman Decl. Exs. B, C, D.) With respect to the auditing standards actually employed by PwC,[16] the Letters contained no findings of reportable conditions or material weaknesses. (Liebesman Decl. Ex. B, at 1; Liebesman Decl. Ex. C, at 2; Liebesman Decl. Ex. D, at 2.) Although it is conceivable that the underlying reports prepared by PwC may have listed reportable conditions or material weaknesses even though the Auditor's Management Letters made no mention of them, this possibility seems distinctly improbable. Indeed, PwC apparently intended to convey through its Letters that Take-Two's internal controls passed muster under then-applicable auditing standards, though they might not withstand scrutiny under proposed future

---

[16] The Report states that the relevant Auditor's Management Letters "contained no findings of significant deficiencies or material weaknesses to be addressed by the Company's management." (Report 60.) Although this statement is literally true, a closer look at the Letters reveals that PwC did not determine whether there were significant deficiencies in the Company's internal controls, apparently because the "significant-deficiency" language stemmed from a proposed auditing standard not yet applicable to Take-Two. (See, e.g., Liebesman Decl. Ex. C, at 2; Liebesman Decl. Ex. D, at 1-2; see also Report 60-61.) PwC evaluated Take-Two's internal controls by reference to the "reportable-condition" and "material-weakness" language contained in AU 325, Communication of Internal Control Related Matters Noted in an Audit (AU 325), of the AICPA Professional Standards. (Liebesman Decl. Ex. C, at 1; Liebesman Decl. Ex. D, at 1.) The Report should have employed clearer language to describe the conclusions reached by PwC in the relevant Auditor's Management Letters.

standards. (See, e.g., Liebesman Decl. Ex. C, at 2; Liebesman Decl. Ex. D, at 1-2.) Accordingly, the Auditor's Management Letters amply support the Report's conclusion that the Company's internal controls were adequate under then-applicable norms. (Report 62-63.)

In addition to the Auditor's Management Letters, the SLC consulted relevant proxy statements and annual reports, minutes of meetings conducted by Take-Two's Audit Committee, the testing of internal controls under Section 404 of the Sarbanes-Oxley Act ("SOX"), and the Audit Committee SOX 404 Summary--FY 2005. (Report 59.) For the year ended October 31, 2003, PwC certified the accuracy of Take-Two's financial statements, and their conformity with generally accepted accounting principles. (Report 61.) Additionally, in the Forms 10-K for the years ended October 31, 2002, 2003, and 2004, Take-Two's CEO and CFO certified that there had been no significant changes in the Company's internal controls, and that such controls were adequate. (Report 60.) The minutes from relevant meetings of Take-Two's Audit Committee make no mention of weaknesses or deficiencies in Take-Two's financial controls. (Report 60.) Moreover, although the Company disclosed in its Form 10-K for the year ended October 31, 2005, that there were material weaknesses in Take-Two's controls, the SLC determined that this finding postdated the issuance of the 2003, 2004, and 2005 Proxy

Statements, and was made pursuant to auditing standards that had only then become applicable. (Report 62-63.)

Given the totality of the materials relied upon by the SLC, the Court finds that the Committee possessed reasonable bases for its conclusion that St. Clair's internal-control allegations lack merit. Although the SLC undoubtedly could have reviewed the substance of PwC's reports, rather than relying upon the Auditor's Management Letters, the totality of materials consulted by the SLC provided it with reasonable bases to reach the conclusion it did.

### (3) Inability to Predict Returns and Manage Inventory

St. Clair criticizes the SLC for relying upon an internal memorandum prepared by Take-Two in concluding that variations in return rates "'were supportable and reasonable.'" (Pl.'s Opp'n 30-31 (quoting Report 65).) Nonetheless, the Report reveals that the SLC also conducted a quarterly analysis of the Company's returns and gross sales from the quarter ended January 31, 1999, through that ended April 30, 2006. (Report 72.) More importantly, the SLC determined that the only material weaknesses in Take-Two's financial controls that have been identified would not in any way affect the Company's ability to predict returns and manage its inventory. (Report 65.) Given this determination, which St. Clair has not in any way impugned,

the SLC had reasonable bases to conclude that St. Clair's allegations were meritless.

### (4) Overstatement of Inventory and Understatement of Reserves

St. Clair faults the SLC for failing to lay bare the bases for its conclusions regarding Take-Two's inventory and reserve statements. (Pl.'s Opp'n 31.) Although the Report might benefit from further detail, a reasonable factfinder could not determine that the Committee lacked reasonable bases for its findings. The SLC consulted Take-Two's Forms 10-K for fiscal years 2002, 2003, and 2004, and the Company's work papers for calculating the reserves for slow-moving and obsolete inventory for fiscal years 2004 and 2005. (Report 65.) The SLC also analyzed the Company's inventory turnover rates. (Report 65.) On the basis of this information, the SLC determined that Take-Two's reserves "were calculated in a consistent and reasonable manner." (Report 65-66.) The SLC also reviewed the Company's "calculations and methods for computing the inventory reserves," and found "no evidence that the reserve was calculated incorrectly or that the assumptions used in making the calculation were inappropriate." (Report 66.) Additionally, the SLC reviewed Take-Two's quarterly return rates, tested calculations contained in an internal memorandum on significant variations in return rates, and determined that "the variations in return rates are supportable

and the reserve accounts reasonable." (Report 66.) In light of the foregoing, the Court holds that there is no genuine dispute that the investigatory steps taken by the SLC were sufficient to provide reasonable bases for its conclusions.

### (5) Wrongful Capitalization of External Development Costs

St. Clair criticizes the SLC for failing to review "the underlying accounting records" in reaching its conclusion that Take-Two properly capitalized external development costs. (Pl.'s Opp'n 32; see also Hollander Aff. ¶ 10.) The Court is not persuaded that this failure impugns the reasonableness of the bases for the SLC's conclusions. The SLC reviewed at length the policy Take-Two had in place regarding the capitalization of software costs. (Report 67-68.) The SLC determined that the Company's policy was entirely consistent with generally accepted accounting principles. (Report 69.) Moreover, the SLC found that Take-Two had consistently followed its own policy. (Report 69.) In reaching this determination, the SLC reviewed acquisition documents pertaining to software purchased during the years ended October 31, 2002, 2003, and 2004, as well as relevant royalty contracts and accounts for prepaid royalty maintained by the Company. (Report 68.) Additionally, the SLC reviewed pertinent public filings and consulted with several members of Take-Two's management. (Report 67.) Based on these materials,

the SLC was able to determine what external costs Take-Two actually capitalized (Report 68-69), and find that such capitalization was consistent with the Company's accounting policy (Report 69). In light of the foregoing, the SLC possessed reasonable bases for its conclusions regarding Take-Two's allegedly improper capitalization of external development costs.

### (6)    One-Time Tax Boost

St. Clair contends that the SLC placed too much emphasis upon the filing of Take-Two's ameliorative Form 10-Q in the first quarter of 2005 in disposing of the AC's allegations regarding the touting of tax benefits. (Pl.'s Opp'n 32-33.) St. Clair ignores, however, other significant bases for the SLC's conclusion that these allegations lack merit, including (1) the absence of evidence that the 2004 Form 10-K "touted" tax benefits; (2) the fact that Take-Two's effective tax rate was actually lower in fiscal year 2005 than in 2004; (3) the fact that the Extraterritorial Income Exclusion was actually higher in fiscal year 2005 than in 2004; and (4) the absence of any prospective statement regarding income tax in either Take-Two's 2005 Proxy or its 2004 Form 10-K. (Report 75.) These considerations amply support the SLC's conclusion regarding the lack of merit in St. Clair's tax-touting allegations.

**(7) Accounting Manipulations Relating to Acquisitions**

St. Clair faults the SLC for employing inadequate procedures to evaluate goodwill and investigate reserve accounts. (Pl.'s Opp'n 33-34.) The Court holds, nevertheless, that the SLC possessed reasonable bases for its conclusions. In order to test St. Clair's allegations, the SLC obtained the closing binders for the acquisitions at issue and recalculated the relevant acquisition prices, specifically with reference to identifiable intangible assets and goodwill. (Report 77.) In the two instances in which the SLC's recalculations did not match Take-Two's stated valuations, the SLC consulted independent, third-party appraisals, where available, or the Company's workpapers. (Report 77-78.) The SLC determined in every instance that the Company's valuations of goodwill "were reasonable, consistent[,] and based on clearly identifiable facts and circumstances." (Report 78.) The SLC also reviewed subsequent filings to determine if charges for goodwill impairment were ever taken, and found none, thereby supporting the reasonableness of the Company's valuations. (Report 78.) The SLC found no evidence that Take-Two ever carried forward the value of contingent earn-outs that it knew never would materialize. (Report 78.) Given that the SLC performed a thorough review of Take-Two's valuations of its acquisitions and found these

valuations to be entirely appropriate, the Committee possessed reasonable bases to find St. Clair's allegations in this respect meritless.

(8)     **Discretionary Account Manipulations**

St. Clair criticizes the SLC for relying too heavily upon Take-Two's public filings in disposing of its allegation that the Company manipulated discretionary account accruals. In addition to these public filings, however, the SLC also (1) considered a letter prepared by Blank Rome, which thoroughly analyzed the Company's 2002 and 2003 accounts-receivable provision for doubtful accounts and sales allowance; (2) interviewed members of Take-Two's management to determine that the policies described in Blank Rome's letter, and evidently found acceptable by the SEC, had not changed during 2004; (3) analyzed quarterly returns and gross sales from the quarter ended January 31, 1999, through that ended April 30, 2006; and (4) examined changes in the Company's reserves as a percentage of related assets fiscal year 2004 to fiscal year 2005. (Report 85.) With respect to the increase in reserves as a percentage of related assets in 2005--an event to which the AC attaches great importance--the SLC cited with approval Take-Two's explanation that the Hot Coffee Mod had caused an increase in reserves in 2005, while the release of GTA:SA at the close of fiscal year 2004 had caused a drop in allowances for that year. (Report 85-

86.) In light of the foregoing, the Court holds that the SLC had reasonable bases to conclude that St. Clair's allegations regarding the manipulation of discretionary account accruals "lack[] any basis in fact." (Report 86.)

The Court has reviewed the Report and relevant exhibits submitted by St. Clair, including the depositions of the SLC's members. St. Clair has identified procedures that may have improved the SLC's investigation, especially with respect to the AC's accounting-based allegations. It is therefore unfortunate that St. Clair declined the SLC's offer to meet with St. Clair's professional consultant regarding Counts III, IV, and V. (Report 20.) Nevertheless, a special litigation committee, charged with determining what, in its view, is in the best interests of the corporation, must be afforded some discretion in selecting the procedures it will employ in that endeavor. Moreover, if committee reports are to be kept to a manageable length, courts cannot demand that they set forth the minutiae of every document that the committee consults, reviews, or analyzes. Here, the SLC employed reasonable procedural tools, and presented its conclusions and the reasons therefor with an acceptable degree of specificity. Accordingly, on the totality of the record before it, the Court finds that the SLC had reasonable bases for its conclusions regarding St. Clair's individual allegations of wrongdoing, as well as for its global conclusion that continued

pursuit of the Derivative Claims is not in Take-Two's best interests.

In summary, the SLC has demonstrated that there is no genuine dispute that its members are independent, acted in good faith throughout the prosecution of their duties, and possessed reasonable bases for their conclusions. Therefore, the SLC has satisfied Zapata's first step.

Furthermore, the Court declines to exercise its discretion to proceed to Zapata's second step. The Delaware Supreme Court has indicated that this step

> is intended to thwart instances where corporate actions meet the criteria of step one, but the result does not appear to satisfy its spirit, or where corporate actions would simply prematurely terminate a stockholder grievance deserving of further consideration in the corporation's interest.

Zapata, 430 A.2d at 789. Here, dismissal of the Derivative Claims would not, in the Court's view, run counter to the spirit of step one. To the contrary, the Zapata procedure was designed to restore to the corporation its traditional authority to control suits brought on its behalf. Take-Two complied with the letter and spirit of Zapata step one, and thereby regained control over the Derivative Claims. Further, dismissal of the Derivative Claims would not, to the Court's mind, be premature. The SLC has performed a thorough investigation. Moreover, the underlying wrongs alleged in the AC occurred three, four, five,

and six or more years ago. Therefore, the Court declines to exercise its own business judgment to determine whether continued prosecution of the Derivative Claims is in Take-Two's best interests. See, e.g., Kaplan, 484 A.2d at 520 (reaching same conclusion), aff'd Kaplan, 499 A.2d at 1192 ("Proceeding to the second step of the Zapata analysis is wholly within the discretion of the [lower] court . . . .").

In light of the foregoing, the Court dismisses Counts I through V of the AC. Moreover, because the Report necessarily forecloses liability on Count VI of the AC, insofar as it determined that the individuals charged therein did not know of the Sex Minigame before the Hot Coffee Mod was developed (Report 51-54), the Court also dismisses Count VI of the AC, in conformity with the SLC's request (Mot. Dismiss / Consolidate 12).

## B. The Direct Claims Stand

Although Counts VII through XI of the AC purportedly assert direct claims for relief on behalf of the putative class, the Court must nevertheless scrutinize these claims to determine whether they are in fact direct in nature. See Dieterich v. Harrer, 857 A.2d 1017, 1027 (Del. Ch. 2004) ("[T]he court must look to all the facts of the complaint and determine for itself whether a direct claim exists.") (citations omitted); see also Gentile v. Rossette, 906 A.2d 91, 99-103 (Del. 2006)

(determining whether claims set forth in complaint were direct or derivative); <u>Tooley v. Donaldson, Lufkin & Jenrette, Inc.</u>, 845 A.2d 1031, 1035-40 (Del. 2004) (same). In determining whether a claim for relief is derivative or direct, the Court must answer two questions: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" <u>Tooley</u>, 845 A.2d at 1033.

The SLC relies upon this Court's earlier opinion granting its motion for a stay, <u>see</u> <u>St. Clair</u>, 2006 WL 2849783, to argue that St. Clair's Direct Claims are actually derivative in nature. (Mot. Dismiss / Consolidate 13-14.) In that opinion, the Court questioned whether St. Clair could advance both direct and derivative claims for relief without encountering an impermissible conflict of interest. <u>St. Clair</u>, 2006 WL 2849783, at *7 (collecting cases). In order to avoid this potential conflict, the Court scrutinized St. Clair's allegations to determine whether they asserted direct or derivative injuries. <u>Id.</u> at *7-*8. Because the harm allegedly caused by the proxy statements in question flowed primarily to Take-Two, the Court decided to treat St. Clair's proxy claims as derivative in nature, for purposes of resolving the SLC's motion for a stay. <u>Id.</u> at *8. In so doing, the Court elided the potential conflict

issue and advanced the interests of efficiency, as it had already decided to stay St. Clair's nearly identical, concededly derivative claims, see id. at *6-*7.

At this juncture, the potential conflict noted by the Court is no longer present, because the Court decided, supra, Part II.A, to dismiss the Derivative Claims. Accordingly, St. Clair no longer purports to assert both direct and derivative claims. Additionally, the efficiency concerns that motivated the Court's stay of St. Clair's purported direct claims in order to permit contemporaneous treatment of the already-stayed derivative claims are absent. Thus, the Court must consider anew whether the Direct Claims allege derivative or direct harms.

Here, St. Clair alleges that the defendants omitted material information from proxy statements issued in 2001, 2002, 2003, 2004, and 2005 (AC ¶¶ 229, 236, 243, 250, 257), which caused shareholders to approve various additions to the Company's stock-option plans that they otherwise would not have ratified (AC ¶¶ 230, 237, 244, 251, 258). St. Clair further avers that the defendants' material omissions violated putative class members' voting rights (AC ¶¶ 231, 238, 246, 253, 260), and caused a dilution of class members' ownership interest as a result of the wrongful addition of shares to the Company's Stock Option Plans (AC ¶¶ 232, 239, 245, 252, 259). Claims arising out of allegedly misleading proxy statements may be brought both

directly and derivatively. <u>Katz v. Pels</u>, 774 F. Supp. 121, 127 (S.D.N.Y. 1991). Moreover, though the injury resulting from misleading proxy statements often flows principally to the corporation, rather than to individual shareholders, <u>J.I. Case Co. v. Borak</u>, 377 U.S. 426, 432 (1964), St. Clair's allegations in Counts VII through XI focus exclusively upon the harm to putative class members' right to cast an informed vote and upon the dilution of putative class members' ownership interest. At least with respect to the right to cast an informed vote, Delaware courts permit shareholders to bring a direct action for relief. <u>See, e.g.</u>, <u>In re J.P. Morgan Chase & Co. S'holder Litig.</u>, 906 A.2d 766, 772 (Del. 2006) ("This Court has recognized . . . that where it is claimed that a duty of disclosure violation impaired the stockholders' right to cast an informed vote, that claim is direct.") (citing <u>In re Tri-Star Pictures, Inc., Litig.</u>, 634 A.2d 319, 330 n.12, 332 (Del. 1993)). Thus, because Counts VII through XI allege harms to individual shareholders' voting and ownership rights, they advance direct claims for relief.[17]

---

[17] That is not to say that St. Clair has adequately pleaded its claim that the defendants' disclosure violations entitle putative class members to monetary damages (AC 94). <u>See</u> <u>In re J.P. Morgan Chase</u>, 906 A.2d at 772 (parsing distinctions between "(i) whether the proxy disclosure claim is direct, (ii) whether that disclosure claim, if valid, would entitle the plaintiffs to recover compensatory damages, and (iii) if so, how those compensatory damages should be measured"); <u>see also</u> <u>Loudon v.</u>

Accordingly, the Direct Claims are not subject to the demand requirement and cannot be dismissed for failure to make a demand upon the Board.

Furthermore, the Court denies the SLC's request to consolidate the Direct Claims with derivative litigation pending before Judge Swain. <u>See</u> <u>In re Take-Two Interactive Software, Inc. Deriv. Litig.</u>, 06 Cv. 5279 (LTS) (DFE). The long pendency of the Direct Claims before this Court has reduced significantly any efficiencies that might otherwise have been garnered through the proposed consolidation. Indeed, the special litigation committee investigating the claims before Judge Swain has already moved to dismiss certain parties from the action and to assign certain claims to the Company. 06 Cv. 5279 (LTS) (DFE), Dkt. No. 67. Additionally, the action before Judge Swain involves derivative litigation (Mot. Dismiss / Consolidate 19), while the Court has determined that the remaining claims in this litigation are direct in nature. This Court is amply familiar with the AC's options-backdating allegations, and currently

Archer-Daniels-Midland Co., 700 A.2d 135, 142 (Del. 1997) ("<u>Tri-Star</u> stands only for the narrow proposition that, where directors have breached their disclosure duties in a corporate transaction that has in turn caused impairment to the economic or voting rights of stockholders, there must at least be an award of nominal damages."). The Court will not determine whether St. Clair has adequately pleaded its request for monetary relief on the Direct Claims without the benefit of briefing on the issue. In any event, St. Clair has also requested equitable relief (AC 95), which may not be subject to the same strictures as its claims for monetary relief.

presides over securities-fraud litigation involving similar allegations, see In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d at 257-59, 281-306. In short, consolidation is not warranted at this time.[18]

## III. Conclusion

In light of the foregoing, the Court dismisses Counts I through VI of the AC, pursuant to the SLC's recommendation. On the other hand, the Court denies the SLC's motion to dismiss Counts VII through XI of the AC.

The parties shall confer to set a briefing schedule for the defendants' motions to dismiss, if any, and shall file a stipulated schedule no later than August 18, 2008. If the parties are unable to agree upon a schedule, they shall inform the Court on or before August 18, 2008, and the Court will set a schedule itself.

SO ORDERED.

_____
SHIRLEY WOHL KRAM
UNITED STATES DISTRICT JUDGE

Dated:    New York, New York
          July 30, 2008

_____

[18] Should the parties come forward with more compelling evidence of the efficiencies achievable through the consolidation of the Direct Claims with the litigation now pending before Judge Swain, the Court will not foreclose reconsideration of the issue.

presides over securities-fraud litigation involving similar allegations, see In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d at 257-59, 281-306. In short, consolidation is not warranted at this time.[18]

## III. Conclusion

In light of the foregoing, the Court dismisses Counts I through VI of the AC, pursuant to the SLC's recommendation. On the other hand, the Court denies the SLC's motion to dismiss Counts VII through XI of the AC.

The parties shall confer to set a briefing schedule for the defendants' motions to dismiss, if any, and shall file a stipulated schedule no later than August 18, 2008. If the parties are unable to agree upon a schedule, they shall inform the Court on or before August 18, 2008, and the Court will set a schedule itself.

SO ORDERED.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/30/08

SHIRLEY WOHL KRAM
UNITED STATES DISTRICT JUDGE

Dated:    New York, New York
          July 30, 2008

---

[18] Should the parties come forward with more compelling evidence of the efficiencies achievable through the consolidation of the Direct Claims with the litigation now pending before Judge Swain, the Court will not foreclose reconsideration of the issue.