# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

---

N⁰ 06 Civ. 688 (RJS)

---

ST. CLAIR SHORES GENERAL EMPLOYEES RETIREMENT SYSTEM,

Plaintiff,

VERSUS

PAUL EIBELER, ET AL.,

Defendants.

---

OPINION AND ORDER
September 8, 2010

---

RICHARD J. SULLIVAN, District Judge:

Plaintiff St. Clair Shores General Employees Retirement System brings this action against Defendants, ten former officers and directors of Take-Two Interactive Software, Inc., for breaching their fiduciary duties under Delaware law by making material omissions and misstatements in Take-Two's 2001 to 2005 Proxy Statements and the accompanying Annual Reports. Plaintiff alleges that these failures to disclose led Take-Two's shareholders to approve some 9.3 million additional shares for the company's stock option plans, which, once issued, diluted Plaintiff's equity in Take-Two and impaired its voting rights.

Defendants now move to dismiss all remaining claims pursuant to Federal Rule of Civil Procedure 12(b)(6), or, in the alternative, Rule 9(b). For the reasons stated below, the Court grants Defendants' motion to dismiss for failure to state a claim in its entirety.

## I. BACKGROUND

### A. Facts[1]

Plaintiff's first six causes of action have already been dismissed by a July 30, 2008 opinion and order of the late Honorable Shirley Wohl Kram, District Judge. *See St. Clair Shores Gen. Emps. Ret. Sys. v. Eibeler*, No. 06 Civ. 688 (SWK), 2008 WL 2941174, at *22 (S.D.N.Y. July 30, 2008).

---

[1] Unless otherwise indicated, the following facts are taken from the Amended Derivative and Class Action Complaint (the "Amended Complaint" or "AC").

The Court presumes the reader's familiarity with the facts and disposition set forth in that opinion and will only recount the facts necessary for the resolution of Plaintiff's remaining claims.

1. Parties

Plaintiff is a defined benefit plan organized to provide pension benefits to the employees of the city of St. Clair Shores, Michigan. (AC ¶ 14.) It brings this suit on behalf of itself and a class of all other persons, excluding Defendants, who owned common stock in Take-Two and who were entitled to vote at the annual shareholders' meetings in 2001-2005. (*Id.* ¶ 37.)

Take-Two "develops, publishes and distributes interactive software games for personal computers, videogame consoles, and handheld videogame platforms." (*Id.* ¶ 17.) The company received national attention in 2005, when its premier video game, "Grand Theft Auto: San Andreas" ("San Andreas"), was found to contain a sexually explicit mini-game within its coding. (*Id.* ¶¶ 60-78.)[2]

The Amended Complaint also names as Defendants various former officers and directors of Take-Two, including Defendants Paul Eibeler, Gary Lewis, Ryan Brant, Kelly Sumner, Richard Roedel, Jeffrey C. Lapin, and Karl H. Winters, each of whom served as a director and officer of Take-Two at some point during the class period. (AC ¶¶ 18-19, 24-29.) Defendants Todd Emmel, Robert Flug, Oliver R. Grace, Mark Lewis, and Steven Tisch each served as outside directors at some point during the Class Period. (*Id.* ¶¶ 19-23.)

2. Disclosure Violations

Claims VII through XI allege that Defendants breached their duty to shareholders by failing to disclose misconduct that was occurring at Take-Two from 2001 through 2005, while simultaneously asking shareholders to approve additional shares for the company's stock options plans. (*Id.* ¶¶ 229, 236, 243, 250, & 257.) As set forth below, the undisclosed wrongdoing includes the backdating of stock options and various other accounting irregularities.

a. Options-Backdating Allegations

On July 10, 2006, Take-Two announced that it was the subject of an informal Securities and Exchange Commission ("SEC") investigation regarding its stock-option-granting practices. (*Id.* ¶ 79.) Later, on December 11, 2006, Take-Two announced that its Special Litigation Committee ("SLC") had, in conjunction with outside legal counsel, concluded "that there were improprieties in the process of granting and documenting stock options and that incorrect measurement dates for certain stock option grants were used for financial accounting purposes." (*Id.*)

According to Take-Two's 2006 10-K, the SLC found that Take-Two "did not maintain adequate control and compliance procedures for options grants, and did not generate or maintain adequate or appropriate documentation for such grants." (*Id.* ¶ 82.) The SLC also "determined that [Defendant] Brant made virtually all of the option granting decisions even though the Company's stock option plans required that the Compensation Committee make those

---

[2] Take-Two was dismissed as a nominal Defendant by Judge Kram's July 30, 2008 opinion, which dismissed the derivative claims — Claims I through VI of the Amended Complaint. *See St. Clair Shores*, 2008 WL 2941174, at *22.

2

grants." (*Id.* ¶ 82.) The SLC concluded that "while the members of the Compensation Committee abdicated their responsibility, with respect to the granting of stock options, they did not engage in any willful misconduct or other dishonest acts." (*Id.*)

The Manhattan District Attorney's Office brought criminal charges against Defendant Brant, as well as Take-Two's former general counsel, Kenneth Selterman, and its chief accounting officer, Patti Tay. (*Id.* ¶ 81.) Selterman and Tay each pled guilty to falsifying business records in connection with the options backdating. In addition, the SEC brought a civil enforcement action against Brant alleging that the backdating scheme was "undertaken with the 'knowledge and participation of other Take-Two officers.'" (*Id.* (quoting the SEC complaint).) Brant and the SEC ultimately settled the civil suit. (*Id.*)[3]

On February 28, 2007, the Company filed restated financial statements for the period of April 1997 through October 31, 2005. (*Id.* ¶ 82.) The restatements adjusted compensation expenses by $42.1 million to account for the backdated options granted from 1997 to 2005. (*Id.*) The Board also disclosed that each of the directors who had received backdated options had agreed to (1) cancel a sufficient number of outstanding stock options to equal the amount of after-tax gains they had received upon the exercise of backdated options; and (2) re-set the exercise price of backdated options that had not yet been exercised. (*Id.* ¶ 83.) The Amended Complaint also alleges that "Defendants received millions of dollars of option grants purportedly issued on unusually favorable and statistically improbable dates during at least the period from 2001 through 2003." (*Id.* ¶ 86.) From these facts, Plaintiff concludes that "Defendants either knowingly or recklessly participated in an options backdating scheme with the direct intent and purpose of enriching themselves at Take-Two's expense." (*Id.* ¶ 85.)

b.  Other Misconduct

Unrelated to the backdating scheme, Plaintiff alleges a plethora of other misconduct, including weaknesses in the company's financial controls (*id.* ¶ 132); accounting and inventory irregularities, such as reversion to "channel stuffing practices," in which Take-Two retail partners would pay for and receive products at the end of a fiscal period on the condition that Take-Two would repurchase those products in the next fiscal period (*id.* ¶¶ 133-134, 145, 157-158); and misrepresenting the potential upside to a one-time "tax boost" (*id.* ¶ 155). In addition, Plaintiff alleges that Defendants "misrepresented the content of the San Andreas game to the Entertainment Software Rating Board ("ESRB"), thereby threatening the viability of the Company's premier product." (*Id.* ¶ 160.) Finally, the Amended Complaint alleges that by failing to disclose the departure of Take-Two's chairman, Defendant Roedel, in 2005, and his reason for doing so, the Defendants breached their fiduciary duty of disclosure. (*Id.* ¶ 159.)

\* \* \*

Annually, from 2001 to 2005, Take-Two filed proxy statements with the SEC. (AC ¶ 105.) The proxy statements, filed on

---

[3] Although the Amended Complaint alleges that "the SEC announced that it had settled criminal charges against Brant" (AC ¶ 81), the Court notes that the SEC does not have criminal enforcement powers. Accordingly, the Court takes judicial notice of the fact that Brant was charged and pled guilty, on February 14, 2007, to New York State charges of falsifying a business record. *See People v. Brant*, No. 644-2007 (N.Y. Sup. Ct.).

3

Schedule 14A, described the requirements of Take-Two's current stock option plan and detailed the option grants made in the prior year. One of the purposes of the proxy statement was to elicit the approval of shareholders for option grants under the then-in-place option plan. (*See, e.g.*, *id.* ¶ 103.)[4]

Plaintiff does not allege that Defendants breached their duties to Take-Two by engaging in the illegal and unethical behavior detailed in the Amended Complaint. Rather, the Amended Complaint alleges that each proxy was false and misleading because it misrepresented information about the stock option plans and grants, as well as failed to disclose other misconduct, described above, that was occurring at Take-Two.

### B. Procedural Background

St. Clair filed the original Complaint in this matter on January 30, 2006. The Complaint advanced various claims arising out of the alleged channel-stuffing scheme (Compl. ¶¶ 33-43, 106), the re-rating of San-Andreas (*id.* ¶¶ 44-63, 110), and Take-Two's deficient internal controls (*id.* ¶¶ 65-83). On March 8, 2006, the Board established the SLC, and on February 16, 2007, the SLC issued its Report, which concluded that the maintenance of the derivative claims was not in Take-Two's best interests. On the basis of that Report, the SLC moved to dismiss all of Plaintiff's claims on March 23, 2007. In response, St. Clair filed the Amended Complaint on August 24, 2007. In addition to supplementing the original claims, the Amended Complaint added new claims arising out of the options-backdating scheme. The Amended Complaint, like the original Complaint, advanced both derivative and direct claims against various former officers and directors of Take-Two.

On September 24, 2007, the SLC filed a new motion to dismiss the Amended Complaint. In her July 30, 2008 opinion, Judge Kram dismissed all of the derivative claims, but did not resolve whether Plaintiff had adequately pled compensable direct claims for disclosure violations in Counts VII through XI and ordered additional briefing, *see St. Clair Shores*, 2008 WL 2941174, at *22-24, which became fully submitted on January 16, 2009.[5] Upon the passing of Judge Kram, the case was reassigned to my docket on September 11, 2009. The Court heard argument on the remaining claims on November 23, 2009.

In Defendants' remaining motions, they argue that all five disclosure claims, one for each proxy filed between 2001 to 2005, should be dismissed because (1) Plaintiff has failed to allege the sort of damages that entitle Plaintiff to any relief under Delaware law, (2) Plaintiff has failed to plead its claims sounding in fraud with the particularity required by Federal Rule of Civil Procedure 9(b), and (3) at least with respect to some Defendants, the exculpatory provisions of Take-Two's certificate of incorporation shield them from liability. Because Plaintiff has not alleged facts

---

[4] Take-Two's 2001 proxy pertained to its 1997 Stock Option Plan and sought an additional 1.5 million shares under that plan. (AC ¶¶ 108, 118.) Its 2002 proxy similarly reported on the activities and purpose of the 1997 plan (*id.* ¶¶ 121, 123) but sought approval of an entirely new options plan, the 2002 Plan, which allocated three million shares for the program (i*d.* ¶ 125.) The 2003, 2004, and 2005 proxy statements all addressed options granted under and additional shares sought for the 2002 Plan. (*Id.* ¶¶ 129-130, 139-140, 148-150.)

[5] Defendant Roedel did not originally move to dismiss the claims. He joined in the individual Defendants' motions, however, on November 2, 2009. (*See* Doc. No. 133.)

4

sufficient to support recovery of the damages that it seeks, the Court will not address Defendants' alternative arguments.

## II. DISCUSSION

### A. Legal Standard

In deciding a motion to dismiss under Rule 12(b)(6), this Court must accept all well-pled allegations contained in the complaint as true, and it must draw all reasonable inferences in favor of the plaintiff. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). A plaintiff need not include "heightened fact pleading of specifics" to survive a Rule 12(b)(6) motion, *id.* at 570, but the "[f]actual allegations must be enough to raise a right of relief above the speculative level, on the assumption that all of the allegations in the complaint are true," *id.* at 555 (citation omitted). Therefore, this standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

Ultimately, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. In contrast, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 555) (citations omitted). Thus, if a plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

### B. Analysis

Delaware law imposes a fiduciary duty upon all directors that requires them to fully and fairly disclose all material information to shareholders when seeking shareholder action. *See Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 143 (Del. 1997). Breaches of the duty to disclose give rise to direct claims because such breaches implicate the shareholder's individual "right to cast an informed vote." *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 772 (Del. 2006). Even though the claim is direct, however, damages are only available where violations are "concomitant with deprivation to stockholders' economic interests or impairment of their voting rights." *Loudon*, 700 A.2d at 146-47; *cf. In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 360 (Del. Ch. 2008) (indicating that Delaware law "is now clear that some breaches of the disclosure duty result in no award of damages at all"). Thus, in order to recover compensatory or nominal damages, "a plaintiff stating a claim against directors for violation of the duty of disclosure must set forth in a well-pleaded complaint allegations sufficient to warrant the remedy sought." *Loudon*, 700 A.2d at 147; *see also J.P. Morgan*, 906 A.2d at 776 (dismissing disclosure claims because, even if allegations were true, plaintiffs were not entitled to nominal or compensatory damages); *Thornton v. Bernard Techs. Inc.*, No. Civ.A 962-VCN, 2009 WL 426179, *4-5 (Del. Ch. 2009) (dismissing disclosure claim because neither injunctive nor monetary remedies were adequately pled). Accordingly, the Court must decide whether Plaintiff has adequately alleged the type of harm to the "economic or voting rights of stockholders," *J.P. Morgan*, 906 A.2d at

5

773, that can give rise to compensatory, nominal, or rescissory damages under Delaware law.[6]

### 1. Compensatory Damages

#### a. Applicable Law

In order to recover compensatory damages, Plaintiff must allege that the transaction approved in the false or misleading proxy statements led to some direct injury to its economic or voting interests, separate and apart from injury suffered by the corporation generally. *See Thornton*, 2009 WL 426179, *4-5 (dismissing disclosure claim for failure to show direct injury to shareholder apart from injury to the corporation generally). Moreover, any damages sought must be "logically and reasonably related to the harm or injury for which compensation is being awarded." *J.P. Morgan*, 906 A.2d at 772.

Generally, when a corporation commits waste through overpayment, it is the corporation that is damaged directly and the shareholders suffer only derivative injury. *See J.P. Morgan*, 906 A.2d at 771-72;[7] *see also Tooley v. Donaldson*, 845 A.2d 1031, 1033 (Del. 2004). Delaware law does recognize an exception to this rule — a situation where corporate waste also directly harms shareholders. Specifically, where a stockholder having "majority or effective control" of the company causes it to issue excessive equity in exchange for assets of the controlling shareholder with lesser value, and the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder and a corresponding decrease in the share percentage owned by the minority shareholders, shareholders can maintain a direct suit when challenging the injurious transaction. *See Gatz v. Ponsoldt*, 925 A.2d 1265, 1278-79 (Del. 2007); *Gentile v. Rosette*, 906 A.2d 91, 100 (Del. 2006); *see also Green v. LocatePlus Holdings Corp.*, No. 4032-CC, 2009 WL 1478553, at *2 (Del. Ch. May 15, 2009) (describing this "one transactional paradigm" in which Delaware law recognizes both direct and derivative claims).

---

[6] Plaintiff asks the Court to award "Class damages for defendant's breaches of fiduciary duty in connection with the 2001, 2002, 2003, 2004, and 2005 Proxies." (AC at 94.) In addition, the Amended Complaint seeks the issuance of "a permanent injunction declaring as void each dedication of additional shares to the Company's stock option plans pursuant to the false and misleading proxy statements defendants issued from 2001 to 2005." (*Id.* at 95.) The latter relief, however, is either sought on behalf of the Company or sought for "financial and reputational harm Take-Two has suffered" and is therefore derivative in nature. (*Id.*) All derivative claims were disposed of by Judge Kram's July 30, 2008 ruling. *See St. Clair Shores*, 2008 WL 2941174, at *22.

[7] In *J.P. Morgan Chase & Co. Shareholder Litigation*, a case not dissimilar from this one, the Delaware Supreme Court confirmed that shareholders cannot maintain a direct action for waste simply by labeling it a "disclosure" claim, but must allege a separate and direct compensable injury. *See J.P. Morgan*, 906 A.2d at 773. In that case, J.P. Morgan Chase & Co. proposed a stock-for-stock merger in which it would issue its own shares to Bank One at a premium over the latter's closing common stock price. *Id.* at 768. Plaintiffs alleged that the proxy statement seeking shareholder approval of the merger failed to disclose that Bank One had offered to complete the merger for no premium if its CEO could immediately take the reigns of the new company. *Id.* at 769. Thus, plaintiffs alleged that their approval of the $7 billion premium that was paid for Bank One was the unnecessary result of the board's self-interest and a direct consequence of its failure to disclose Bank One's no-premium offer. *Id.* In rejecting plaintiffs' claims, the court concluded that "plaintiffs cite no authority that validates conflating their individual direct claims of liability for a duty of disclosure violation with the compensatory damages flowing from the corporation's separate and distinct underlying derivative claim." *Id.* at 773.

Even where a plaintiff establishes that the transaction connected with the disclosure violation caused direct harm to its voting or economic interests, however, he must still establish that the compensation that he seeks is "logically and reasonably related to the harm or injury for which compensation is being awarded." *J.P. Morgan*, 906 A.2d at 772-73. Thus, there must be facts alleged in the complaint that can support an inference that some amount of damage was caused by the infringement of plaintiff's right to cast an informed vote — rather than simply the harm flowing from the related economic transaction.

### b. Analysis

Plaintiff has failed to plead either damages separate and distinct from those suffered by Take-Two generally *or* damages "logically and reasonably" related to the harm that it suffered — the impairment of its right to cast an informed vote.

Plaintiff here alleges that "Defendants constituted the control group of Take-Two during the years at issue" and that they "either knowingly or recklessly participated in an options backdating scheme with the direct intent and purpose of enriching themselves at Take-Two's expense." (AC ¶¶ 33, 85.) The Amended Complaint, however, fails to plead sufficient facts to support this allegation.

With respect to Plaintiff's assertion that Defendants constituted a control group, Delaware law will not easily label a group of persons a controlling group of shareholders. Normally, a controlling shareholder exists only where a stockholder "'owns more than 50% of the voting power of a corporation'" or similarly "'exercises control over the business and affairs of the corporation.'" *Feldman v. Cutaia*, 956 A.2d 644, 657 (Del. Ch. 2007) (quoting *In re PNB Holding Co. S'holder Lit.*, No. Civ. A. 28-N, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006)). When alleging a control group with majority ownership, a plaintiff cannot simply lump together the holdings of the directors to reach this threshold absent "a voting agreement among the group or a 'blood pact to act together.'" *Id.* (quoting *In re PNB*, 2006 WL 2403999, at *10).

Plaintiff acknowledges that it cannot allege a control group based on the aggregate stock holdings of the Board. (Pl.'s Omnibus Opp'n 13-14.) Nevertheless, Plaintiff claims that it has pled a control group: "there is no difference between a controlling stockholder and the control group of the corporation — the board and the executive officers. Clearly the board and executive officers have the power to manipulate the corporate process." (Pl's SLC Opp'n 17.)[8] Plaintiff is not excused, however, from alleging the equivalent of a "blood pact" between the Defendant directors. *See Dubroff v. Wren Holdings, LLC*, No. 9340-VCN, 2009 WL 1478697, at *3 (Del. Ch. May 22, 2009) (rejecting control group claim because plaintiff failed to allege that the "shareholders are connected in some legally significant way — e.g., by contract, common ownership, agreement, or other arrangement — to work together toward a shared goal" (citing *In re PNB*, 2006 WL 2403999, at *3)).

Far from alleging the existence of a control group, Plaintiff has simply alleged that the Board of Directors did what it is statutorily obliged to do: manage the affairs of the corporation. *See* Del. Code tit. 8

---

[8] Notably, the Amended Complaint does not allege that all Defendants received *backdated* options, but only that they received options under the various stock option plans.

7

§ 141(a).[9] Delaware law will not presume that directors are acting together for purposes of establishing a controlling shareholder simply as a consequence of performing their duties as directors. *See Feldman*, 956 A.2d at 657-58 ("Directors, as a group, are charged by statute with a duty to manage the business and affairs of the corporation they serve, but that simple fact does not make them, either singly or collectively, a controlling shareholder, no matter what their individual or collective holdings may be.") At a minimum, Plaintiff must show some sort of concerted action — the mere assertion that Defendants "abdicated their responsibility" in administering a stock option program is insufficient. If the law were otherwise, disgruntled shareholders could circumvent the important distinction between derivative and direct claims by simply recasting their claim as one for the breach of the duty to disclose. *See J.P. Morgan*, 906 A.2d at 772-73.[10]

Even if Plaintiff could successfully show that Defendants constitute a control group, its claim for compensatory damages would still fail because the harm for which it seeks to recover — the issuance of options to executives — is the same harm suffered by the corporation. *See Gentile*, 906 A.2d at 100 ("Because the means used . . . is an overpayment (or over-issuance) of shares to the controlling stockholder, the corporation is harmed and has a claim to compel the restoration of the value of overpayment. That claim, by definition, is derivative."). Thus, the damages sought by Plaintiff "ha[ve] no logical or reasonable relationship to the harm caused to the shareholders *individually* for being deprived of their right to cast an informed vote." *J.P. Morgan*, 906 A.2d at 773.

2. Nominal Damages

At one time, Delaware law recognized a "virtual *per se* rule of damages for breach of

---

[9] The Amended Complaint does make one specific statement about Defendants' cooperation, alleging that Brant carried out the backdating scheme with the help of "other Take-Two officers." (AC ¶¶ 91, 97.) The Amended Complaint, however, does not provide any support for the proposition that any of the named Defendants besides Brant participated in the backdating. In fact, immediately after alleging that "other Take-Two officers" participated in the scheme, the Amended Complaint alleges that Take-Two's former general counsel, Kenneth Selterman, and its chief accounting officer, Patti Tay, each pled guilty to falsifying business records in connection with the stock option backdating. (*Id.* ¶ 81.) Thus, there is no inference to be drawn that it was the Defendants who knowingly or intentionally participated in Brant's scheme. In fact, the Amended Complaint cites the findings of the SLC for the proposition that "while the members of the Compensation Committee abdicated their responsibility, with respect to the granting of stock options, they *did not engage in any willful misconduct or dishonest act*." (*Id.* ¶ 82 (citing 2006 10-K at 2) (emphasis added).)

[10] A further defect in the Amended Complaint is that there is no allegation that the Defendants were the *sole* beneficiary of the options grants. In fact, the Amended Complaint does not contend that all of the options approved from 2001 to 2005 went to the Defendants. (*Cf.* AC ¶¶ 230, 239, 244, 251, 258 (alleging that cumulatively, some 9.3 million additional options approved for the Options Plans); *id.* ¶ 88 (quoting the 1997 Options Plan which stated that shares would go to "officers, directors, and/or key employees, and/or consultants").) Even of the alleged backdated options, the Amended Complaint acknowledges that some of these went to non-Defendants. (*See, e.g.*, *id.* ¶ 94 (alleging that non-Defendant James H. David received 50,000 backdated options on April 14, 2000; *id.* at ¶ 6 (alleging that "defendants transferred $54.6 million in pre-tax compensation to themselves *and those answering to them*") (emphasis added).) This violates the principle of the direct-harm cases that the *sole beneficiary* of the transaction be the defendants. *See Gentile*, 906 A.2d at 100.

the fiduciary duty of disclosure." *In re Tri-Star Pictures, Inc.*, 634 A.2d 319, 333 (Del. 1993). That is no longer the case. *See J.P. Morgan*, 906 A.2d at 774. Today, a plaintiff's entitlement to nominal damages for a disclosure violation depends upon whether the complaint alleges the specific type of harm to the "stockholder's economic or voting rights" present in *Tri-Star*. *See J.P. Morgan*, 906 A.2d at 774.

*Tri-Star* involved a series of transactions engineered by Coca-Cola, the controlling shareholder of Tri-Star Pictures, Inc. *Tri-Star*, 634 A.2d at 320-21. Coca-Cola, although not a majority shareholder itself, entered into binding agreements with other shareholders to form a control group holding 56.6% of the stock entitled to vote. *Id.* at 321-22. Coca-Cola then orchestrated a transaction whereby Tri-Star would purchase $775 million worth of Coca-Cola subsidiaries in exchange for 75 million new shares of Tri-Star stock worth $900 to $977 million. *Id.* at 322. Soon after the deal was approved, Tri-Star was forced to write down the book value of the assets acquired from Coca-Cola by $200 million and issue new debt of $575 million. *Id.* at 324. Most importantly, Coca-Cola's ownership in Tri-Star skyrocketed from 36.8% to 80%, and amendments attached to the transaction "gave Coca-Cola voting power to veto any merger, business combination or asset sale involving Tri-Star." *Id.* at 323. Two years later, after the minority shareholders had already sued on the first transactions, Coca-Cola executed a two-step merger agreement with Sony Company. *Id.* at 324. Under the terms of the merger, Sony's tender offer for all outstanding Tri-Star shares was followed by a cash-out merger for all non-tendered shares. *Id.* at 324-25. This merger extinguished the standing of the minority shareholders to bring a derivative suit.

The *Tri-Star* opinion primarily turned on whether or not the plaintiffs had alleged direct harm flowing from the transactions such that they were entitled to bring direct challenges to the combination. *Id*. at 327; *cf. Loudon*, 700 A.2d at 137-38 ("Disclosure violations were only one aspect of [Tri-Star]."). After concluding that Coca-Cola was the "controlling stockholder" and "dominate[d] both the board and the Combination," the court determined that the pleadings demonstrated that the minority shareholders had suffered an individual harm as a result of the transactions. *Id.* at 332. The Court concluded that:

> When the end of Coca-Cola's scheme was realized with the consummation of the second step of the Sony merger, it appears on this abbreviated record that the minority were cashed out of their Tri-Star interests for an amount far less than what they would have received had Tri-Star been liquidated immediately prior to the Combination. Again, on this record it appears that Coca-Cola suffered no similar loss, but reaped a substantial profit guaranteed through selective retention, and creative valuation of, the Entertainment Sector assets.

*Id.* at 332. Based on these specific factual allegations, the claims attacking the transaction in *Tri-Star* were clearly direct rather than derivative. Needless to say, the facts in *Tri-Star* are a far cry from the facts alleged here.

Thus, the *Tri-Star* framework requires "a transaction in which a significant stockholder sells its assets to the corporation in exchange for the corporation's stock, and influences the transaction terms so that the result is (i) a decrease (or 'dilution') of the asset value and voting power of the stock

9

held by the public stockholders and (ii) a corresponding increase (or benefit) to the shares held by the significant stockholder." *Turner*, 1999 WL 66532, at *11; *see also J.P. Morgan*, 906 A.2d at 775 (describing *Turner* as a case which "state[s] accurately the narrow scope of *Tri-Star*, as limited by *Loudon*"); *id.* (concluding that where "the entity benefiting from the dilution was not a significant or controlling stockholder," *Tri-Star*'s nominal-damage rule has no application). The "*Tri-Star*" fact pattern that can entitle a plaintiff to an award of nominal damages, therefore, is no different from the situation that converts a derivative claim for waste into a direct one. *Compare Turner*, 1999 WL 66532, at *11, *with Gatz*, 925 A.2d at 1277-79. This is not surprising given that *Tri-Star* was a case principally about shareholders maintaining a direct action for corporate overpayment. *See Tri-Star*, 634 A.2d at 327.

Accordingly, for the same reasons that Plaintiff has failed to state a claim for compensatory damages, it has failed to state a claim for nominal damages.

### 3. Injunctive Relief and Rescissory Damages

As a final remedy, Plaintiff seeks either "a permanent injunction declaring as void each dedication of additional shares to Take Two's stock option plans pursuant to the false and misleading proxy statements defendants issued from 2001 to 2005," (AC ¶ 95) or, should that relief be found unavailable, rescissory damages (*see* Pl.'s Omnibus Opp'n 15).

Take-Two is no longer a party to this litigation and none of the Defendants is currently a director or officer of Take-Two. (*See* AC ¶¶ 18-29.) Thus, no party is capable of effectuating the relief sought.

Accordingly, that claim for relief is now moot. *See, e.g.*, *Alexander v. Yale Univ.*, 631 F.2d 178, 173 (2d Cir. 1980) (concluding that a case becomes moot when "the exercise of the Court's remedial powers would [not] redress the claimed injury"). Even if the claim for relief was not moot, it would be a non-starter. The solicitation of proxies and approval of shares happened between five and nine years ago, and the resulting options have already been issued and exercised. Thus, the relief would not be practicable. *See Gilmartin v. Adobe Res. Corp.*, Civ.A No. 12467, 1992 WL 71510, at *13 (Del. Ch. Apr. 6, 1992) ("The right to cast an informed vote is specific, and its proper vindication in this case requires a specific remedy such as an injunction, rather than a substitutionary remedy." This is so because "[t]he merger, if allowed to go forward, could not be undone, as it will involve the issuance of new . . . securities that will be publicly traded.").

"Rescissory damages 'restore a plaintiff to the position occupied before the defendant's wrongful acts,'" *Schultz v. Ginsburg*, 965 A.2d 661, 669 (Del. 2009) (quoting Black's Law Dictionary, 8th ed., at 419 (2004)) and are "designed to be the economic equivalent of rescission in a circumstance in which rescission is warranted, but not practicable." *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 855 A.2d 1059, 1072 (Del. Ch. 2003). Although early Delaware decisions alluded to the availability of rescissory damages in disclosure cases, *see, e.g.*, *Nebel v. Sw. Bancorp, Inc.*, C.A. No. 13618, 1995 WL 40575, at *2 (Del. Ch. July 5, 1995), Delaware Courts now give "a far more nuanced treatment to the issue of damages for a breach of the duty of disclosure." *Transkaryotic*, 954 A.2d at 359. Like legal remedies, rescissory damages are designed as economic compensation. In fact, the

10

"remedy is grounded upon restitutionary principles." *Ryan v. Tad's Enters., Inc.*, 709 A.2d 682, 698 (Del. Ch. 1996); *cf. Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1145-47 (Del. Ch. 1994) (describing rescissory damages as resting on either restitutionary or compensatory underpinnings).

Accordingly, when a plaintiff has failed to show any direct harm to its economic or voting rights stemming from the disclosure violation, as is the case here, the shareholders are not the appropriate recipients of damages. Accordingly, the Court concludes that Delaware law does not allow an award of rescissory damages where a plaintiff has failed to show entitlement to at least nominal damages.

### C. Leave to Replead

In the closing lines of its memorandum in opposition, Plaintiff seeks leave to amend. (*See* Pl.'s Omnibus Opp. 31.) While Rule 15(a) "'provides that leave to amend shall be freely given when justice so requires, the Court has broad discretion in deciding whether or not to grant such a request.'" *DeBlasio v. Merrill Lynch & Co., Inc.*, No. 07 Civ. 318 (RJS), 2009 WL 2242605, at *41 (S.D.N.Y. July 27, 2009) (quoting *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, No. 06 Civ. 12967 (PAC), 2008 WL 2414047, at *2 (S.D.N.Y. June 12, 2008)); *see also McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). Factors that are relevant to the exercise of the Court's discretion include: (1) the presence of bad faith, dilatory motives, or undue delay on the part of the movant; (2) the potential for prejudice to an opposing party; and (3) whether the sought-after amendment would be futile. *See, e.g.*, *In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 523-24 (S.D.N.Y. 2009). "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to [Rule] 12(b)(6)." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002).

Some courts in this District have required a plaintiff to file a copy of the proposed amended pleading in order to demonstrate that Rule 15(a) relief is appropriate. *See, e.g.*, *In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677 (NRB), 2007 WL 2589482, at *4 (S.D.N.Y. Sept. 8, 2007) ("In the context of a motion to amend, Rule 7(b) . . . requires the movant to supply a copy of the proposed amendment."); *Bankr. Trust of Gerard Sillam v. REFCO Group, LLC*, No. 05 Civ. 10072 (GEL), 2006 WL 2129786, at *5 (S.D.N.Y. July 28, 2006); *Smith v. Planas*, 151 F.R.D. 547, 550 (S.D.N.Y. 1993). At the very least, a party seeking leave to amend must provide some indication of the substance of the contemplated amendment in order to allow the Court to apply the standards governing Rule 15(a). *See, e.g.*, *Horoshko v. Citibank, N.A.*, 373 F.3d 248, 249 (2d Cir. 2004) ("Because an amendment is not warranted '[a]bsent some indication as to what [the plaintiffs] might add to their complaint in order to make it viable,' the District Court was under no obligation to provide the [plaintiffs] with leave to amend their complaint." (quoting *Nat'l Union of Hosp. & Health Care Emp., RWDSU, AFL-CIO v. Carey*, 557 F.2d 278, 282 (2d Cir. 1977))); *Shields v. Citytrust Bancorp*, 25 F.3d 1124, 1132 (2d Cir. 1994). Put simply, "[i]n the absence of any identification of how a further amendment would improve upon the Complaint, leave to amend must be denied as futile." *In re WorldCom, Inc. Sec. Litig.*, 303 F. Supp. 2d 385, 391 (S.D.N.Y. 2004).

"Rule 15(a) is not a shield against dismissal to be invoked as either a

11

makeweight or a fallback position in response to a dispositive motion." *DeBlasio*, 2009 WL 2242605, at *41. Furthermore, Plaintiff has already amended its complaint in this matter and has provided the Court with no inkling of what its amendment might look like or what additional facts may entitle it to relief. Accordingly, Plaintiff's request to amend its pleading is denied as futile.

### III. CONCLUSION

Dismissal of Plaintiff's remaining claims is no doubt a disappointing result for Plaintiff. Nevertheless, it bears noting that those responsible for Take-Two's options-backdating scheme have not escaped unscathed. Nor have the shareholders of Take-Two who ultimately bore the financial burden of those practices been left without recourse. Before this very Court, a class action settlement providing compensation to shareholders in excess of $20 million was preliminarily approved in June. *See In re Take-Two Interactive Securities Litigation*, No. 06 Civ. 803 (RJS) (Doc. No. 161). In another matter in this District, a court recently assigned to Take-Two the prosecution of a civil action against Defendants Brant and Sumner, among others, based on the options backdating scheme. *See In re Take-Two Interactive Software, Inc. Derivative Litigation*, No. 06 Civ. 5279 (LTS). In addition, the SEC brought civil enforcement actions against Take-Two and Defendant Brant, and the Manhattan District Attorney's Office brought criminal charges against Brant and several Take-Two officers. Accordingly, the Court's decision forecloses only one avenue of relief for those injured by Defendants' alleged misconduct.

For the foregoing reasons, Defendants' motion to dismiss is GRANTED, and Plaintiff's request for leave to amend is DENIED. The Clerk of the Court is respectfully directed to terminate the motion located at document number 133 and close this case.

SO ORDERED.

_____
RICHARD J. SULLIVAN
United States District Judge

Dated: September 8, 2010
       New York, New York

\* \* \*

Plaintiff is represented by James Sabella, Michael J. Barry, Sidney Liebesman, and Cynthia A. Calder, Grant & Eisenhofer P.A., 485 Lexington Avenue 29th Fl., New York, NY 10017. Defendant Paul Eibeler is represented by Claiborne Porter and Scott Musoff, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, 42nd Fl., New York, NY 10036 and James Drew Miller, Clifford Chance US, LLP, 31 West 52nd St. New York, NY 10019. Defendants Todd Emmel and Mark Lewis are represented by Andrew Hruska and Louisa Childs, King & Spalding LLP, 1185 Avenue of the Americas, New York, NY 10036. Defendants Robert Flug and Steven Tisch are represented by Gandolfo DiBlasi and Stephen Ehrenberg, Sullivan and Cromwell, LLP, 125 Broad Street, New York , NY 10004. Defendant Oliver R. Grace, Jr. is represented by Charles Stillman, Michael Grudberg, and Nathaniel Kolodny, Stillman, Friedman & Shechtman, P.C., 425 Park Avenue, New York, NY 10022. Defendant Ryan A. Brant is represented by Edward Spiro, Lawrence Iason, and Ellen Murphy, Morvillo, Abramowitz, Grand, Iason, Anello

USDS SDNY
DOCUMENT
ELECTRONICALLY F
DOC #: 9/8/10
DATE FILED:

& Bohrer, P.C, 565 Fifth Avenue, New York, NY 10017.  Defendant Karl Winters is represented by Andrew Lawler, Andrew M. Lawler, P.C, 641 Lexington Avenue, 27th Fl., New York, NY 10022.  Defendant Jeffrey C. Lapin is represented by Ada Davis and Isaac Greaney, Sidley Austin LLP, 787 Seventh Avenue, New York, NY 10019.  Defendant Richard Roedel is represented by David Meister, Scott Musoff, and Clairborne Porter, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, 42nd Fl., New York , NY 10036.